## Lucy H. Clark

*v.*

## Joseph R. Clark.

1. The validity of a marriage is governed by *lex loci.*

2. In contracting marriage, under the law of New York, no solemnization by priest or magistrate is required, nor is the presence of a witness necessary. Consent is the only requisite, and when a man and woman, capable of making a marriage contract, exchange promises by which they take each other as husband and wife, from the instant the promises are made they become at once husband and wife by as valid a contract as they can make.

3. A marriage contract may, like any other fact, be established by any kind of proof which the law regards as legal evidence.

On final hearing on bill, answer and proofs taken orally.

*Mr. Paul A. Queen,* for the complainant.

*Mr. William H. Speer, Jr.,* for the defendant.

Van Fleet, V. C.

This case presents but a single question, and that is, is the defendant the husband of the complainant? The suit is founded on the twentieth section of our statute concerning divorces, and is brought for the purpose of obtaining a decree compelling the defendant to support the complainant. The defendant denies that he ever, in any way or form, entered into a contract of marriage with the complainant. His defence confesses necessarily

abandonment and refusal to support. Hence the complainant's right to the relief she asks depends entirely upon whether or not the marriage she alleges has been satisfactorily proved.

The contract, on which the complainant rests her right to relief, is alleged to have been made in the city of New York, on the 29th day of May, 1889, at a house near one of the entrances to Central Park. For nearly a year prior to the date just mentioned, the complainant had lived with the defendant's father in the village of Lebanon, Hunterdon county, as his housekeeper. The father at this time was about ninety years old, and his family consisted of nobody but the complainant and himself. The defendant, at the time of the alleged marriage, was a widower, about fifty years old, and the father of three children, and had for several years resided in the city of New York, where he was engaged in the business of selling liquors and groceries, by traveling over certain routes, extending through the country adjacent to the city, at stated intervals, to solicit orders. While passing over one of these routes, it was his custom to stop at his father's house at Lebanon and remain there over night. He did so usually once in each fortnight throughout the year. The complainant went to live with the defendant's father in July, 1888, and the defendant made her acquaintance there shortly afterwards. She was then a maiden about twenty-six years old. Soon after they became acquainted, the complainant testifies that the defendant made love to her and asked her to marry him. He admits that he kissed her, romped with her, brought her flowers and gave her a silk umbrella. The complainant says that the defendant repeatedly asked her to marry him, but that she did not consent until March, 1889. Then she says he said to her that he loved her so deeply he could not live without her, and asked her if she loved anybody else, and that she replied that she did not, but confessed that she loved him, and promised that she would marry him, but stated that she could not then because she was not ready. The defendant had a brother living in Paterson. A few days before the day on which it is alleged the marriage took place, the complainant went with Austin Clark (the defendant's father) to Paterson

to visit his son. It had been previously arranged, between the complainant and the defendant, that if the complainant would go to New York, while Austin Clark was in Paterson, the defendant would take her to the Eden Musée. In pursuance of this arrangement, the complainant went from Paterson to New York on the 29th day of May, 1889. She first went to the store where the defendant was employed. From there the defendant took her to a restaurant. While in the restaurant, the complainant swears the defendant reminded her of her promise to marry him, and asked why not do it then. She replied that she was not ready. To which he said that she was as ready then as she ever would be. To this she said she was not properly dressed to marry—she had an old dress on—and he answered that that was the smallest part of it. They then went to the Eden Musée. While there, the complainant says the defendant again urged her to marry him and that she declined because her gloves were too much soiled, whereupon the defendant said he would get her a new pair, and she then consented. On leaving the Eden Musée, the complainant says the defendant took her to a store near the Eden Musée and bought her a pair of gloves, and while there told her that he knew a clergyman living near Central Park, whom he would get to solemnize their marriage. They then went to Central Park, and after visiting several places of interest, the complainant says as they came out the defendant took her to a house near the park, which he said was the residence of the Rev. Mr. Smith. On entering this house, the complainant swears the defendant stated that he and she had come there to be married. They were requested to pass into the front room, and that very soon afterwards the person who had admitted them brought in a book and asked her her age, and after she had given it they were directed to write their names in the book, and, after they had done so, they stood up side by side and joined hands. Then the person who had admitted them and brought in the book asked the defendant if he took the complainant as his wife. He replied he did. The complainant was then asked if she took the defendant as her husband. She replied she did. A short

Clark v. Clark.

prayer followed, and at its conclusion the person who had asked the questions and made the prayer pronounced them to be husband and wife. The complainant further says that the defendant gave the person who acted the part of a clergyman some money—how much she does not know—and that this person then remarked that he had no blank certificate of marriage, but would make out one and send it to the defendant, whereupon the defendant gave his address at his place of business and not at his residence. As they left the house, the complainant also says the defendant directed her to say nothing about their marriage to anyone, but to return with his father to Lebanon and remain there until the following fall when he would take her to his home. The defendant then went with the complainant to the depot of the Erie railway, and she returned to Paterson. Before they separated, the complainant says it was arranged that the defendant should go to Lebanon the following Saturday and that she should be there to meet him, but that she was prevented from performing her part of the arrangement by a storm which made it imprudent for her to attempt to take Austin Clark to Lebanon on Saturday, and that, in consequence of the storm, they did not return until the following Monday. On Tuesday, the next day after the complainant and Austin returned, the complainant swears that she received a letter from the defendant, addressed to her by her maiden name, and which had been mailed at Yonkers, the opening words of which were "My darling wife," and the closing, "Your happy husband, Ramsey," and in which the defendant said he had been at Lebanon the previous Saturday, was disappointed not to find the complainant there, and stayed in the house alone over night and had been so lonesome that he could not sleep, and then expressed a hope that when he came out again he would have an opportunity to see the complainant alone. The complainant also says that the defendant did not come to Lebanon again until Thursday of the following week, and that the marriage was then consummated by sexual intercourse, and that that was the first time that the defendant and she had ever had sexual intercourse.

The defendant admitted that on the 29th day of May, 1889, he took the complainant to the Eden Musée and to Central Park, and that he went with her from the park to the depot of the Erie railway; indeed, he admitted all the occurrences described by the complainant as having taken place on that day, except that then or on any other day he asked her to marry him, or that on that day he bought her a pair of gloves, or that on that day they went into a house near the park and made a contract of marriage. He also denies that on the Tuesday following, or at any other time, he wrote and mailed a letter to the complainant containing the expressions, and of the purport and effect, testified to by her.

The contract on which the complainant rests his right to relief was made in the State of New York, and its validity must, consequently, be determined by the law of that state. If valid there it must be held to be valid here. Now, there can be no doubt that, if the parties made promises to each other in the manner and of the kind sworn to by the complainant, according to the law of New York they became, by force of such promises, *eo instante*, husband and wife. And this would be the legal effect of an exchange of such promises, whether they were exchanged in the presence of a witness possessing neither civil nor ecclesiastical authority, or in the absence of any witness whatever. By the law of New York, marriage is a civil contract. No solemnization by priest or magistrate is required; nor is the presence of a witness necessary. Consent is the only requisite; and when a man and woman capable of making such a contract exchange promises by which they take each other, from the instant the promises are made, as husband and wife, they become at once husband and wife by as valid a contract as they can make. And the making and existence of such a contract may, like any other fact, be established by any kind of proof which the law recognizes as legal evidence. While the law, as thus stated, has been declared in many cases, but two quotations will be made. The first is from the opinion of Judge Folger, in *Brinkley* v. *Brinkley, 50 N. Y. 184, 197,* where he said: " The law is well settled that a man and woman, without the presence

of a witness, without the intervention of minister or magistrate, by words of present contract between them, may take upon themselves the relation of husband and wife, and be bound to themselves and to society as such." The other is from the opinion in *Clayton* v. *Wardell,* 4 *N. Y. 230, 232,* where Judge Harris, speaking for the majority of the court, said in substance, " that since the Reformation, marriage is no longer regarded as a sacrament, but as a civil contract. And like every other contract, all that is necessary for its validity is the deliberate consent of competent parties entering into a present agreement to take each for husband and wife.  *  *  *  And the existence of a marriage contract is a fact which may be proved, like any other fact, either by positive evidence or by evidence from which it may be inferred." Like views have been expressed in many other cases. In addition to the two already mentioned, four only will be cited. *Fenton* v. *Reed, 4 Johns. 52; Jackson* v. *Winne, 7 Wend. 47; Canjolle* v. *Ferrie, 23 N. Y. 90; Gall* v. *Gall, 114 N. Y. 109.*

We come now to the question on which the decision of the case must turn, namely, is the defendant the husband of the complainant? Or, stated in another form, has the marriage, on which the complainant's action rests, been satisfactorily proved? The burden is on the complainant. Unless the case contains sufficient evidence to produce a clear conviction in the mind of the court that the parties entered into a contract of marriage in the city of New York, on the 29th day of May, 1889, no relief can be awarded to the complainant. The person in whose presence the complainant says the mutual promises were made has not been examined as a witness. The complainant and her counsel, after extended inquiry and diligent search, have been unable to find him or discover the least trace of him. Nor has the complainant been able to identify the house into which she says the defendant took her when they came out of the park. Her inability to remember the house with sufficient clearness to be able, after the lapse of two or three years, to point it out, does not appear to me to be either unnatural or improbable. She was born in a rural country and had lived there all her life.

She appears to have been a simple-minded country girl. This was her second or third visit to the city of New York and the first time she had ever been in Central Park. The sights and sounds by which she was surrounded were so new and strange to her as to create, naturally, a·feeling of bewilderment. But, in addition, if her story is true it is highly probable that, as she entered this house her mind and heart were so engrossed with thoughts of her marriage as to have excluded everything else and rendered her unobservant, if not insensible, to her surroundings. Her inability to remember the house, under the circum-stances, serves rather, as I think, to confirm than to disprove the truth of her evidence.

The case, in respect to its vital fact, being destitute of other proof than that furnished by the oaths of the parties, it is clear that the complainant cannot prevail unless her evidence in proof of that fact has been so strongly corroborated, or the evidence of the defendant, as to material facts, has been so effectually impeached, as to convince the court that her evidence as to that fact is true and his is false. The conclusion I have reached is that her evidence as to the fact of marriage is true and his is false. That was my impression when the proofs were closed. Since then the argument of counsel and a full and careful consideration of the evidence have resulted in changing what was then but an unsettled and untested belief into a strong conviction.

There was a marked difference in the demeanor of the parties while testifying. The complainant's demeanor was that of an honest witness, who felt that she was under a supreme obligation to tell the truth regardless of consequences. She gave her evidence with apparent candor, without any attempt at evasion, and never hesitated to testify to the truth because she thought it might hurt her case or lay the foundation for a contradiction. The defendant, on the contrary, testified with a languid, weary air, as though it were an irksome and disagreeable task for him to try to recall that part of his life which had been associated with the complainant. He hesitated when there was no apparent reason for hesitation. Some of his answers were so im-

probable as to shock credulity; others were evasive; and one that he gave, which admitted, inferentially, that there had been a secret marriage, he himself afterwards denounced as false. This particular answer was given in describing his last interview with the complainant prior to the birth of their child. From May, 1889, to August, 1891, the defendant visited the complainant every week or every two weeks. He ceased visiting her altogether in August, 1891. He knew as early as the spring of 1891 that she was pregnant. He was asked whether, during his last visit, in August, 1891, he and the complainant had had any conversation respecting her condition and the birth of their child. He answered that they had had, and that he had told her that if she would come to New York to give birth to the child he would make provision for her and see that she was taken care of and would afterwards take the child. He also said that she was not willing to do this. He was then asked, "What did she say?" and he replied, "She wanted me to *publicly* marry her." This question then followed: "Did she use the word *publicly?*" and he answered, "No." His counsel then asked, "Why, then, did you use the word 'publicly,' if she did not use it?" to which he replied, "I don't know; it was a mere figure of speech; I don't know how it came into my mind." What fact he meant to typify by this figure of speech he did not state, but left that involved in as much mystery as he did why or how the figure itself happened to arise in his mind. Neither the manner in which the defendant gave his evidence, nor his evidence itself, inspired my confidence. He appeared to be testifying rather with a purpose to defeat the complainant's claim than to lay bare the whole truth as he understood it.

The truth of the complainant's evidence as to the fact of marriage is confirmed by a written admission made by the defendant with deliberation. In October, 1891, about a month before the birth of the child, the defendant wrote a letter to the complainant and sent it to her by mail, addressed as follows: "Mrs. Lucy Clark, care Austin Clark, Lebanon, N. J." The envelope is in evidence, and the fact that it was addressed in the

42

form above given, by the defendant, with his own hand, is admitted. It is also an admitted fact that the complainant had, shortly before this letter was written, insisted that the defendant should thereafter, in his correspondence with her, address her as his wife. The circumstances which induced the complainant to make this insistment were, as described in her evidence, as follows: She had, in obedience to the defendant's request, kept their marriage secret as long as she could do so with safety to her honor; she was now big with child, and every person who looked at her knew her condition; the defendant had just sent her a telegram addressed to her by her maiden name—Miss Lucy Harr; she then wrote to the defendant, stating that he had given her his name; that she had a right to it and he must never again address her by her maiden name. The next time he wrote to her, the complainant says, his letter was enclosed in the envelope which is in evidence.

The defendant, in attempting to explain how it happened that he addressed this letter to the complainant as his wife, manifested great confusion of recollection. He first said that he was induced to address this letter in the way he did by a letter which the complainant had written to him and which he had destroyed. He also said that it was his custom to destroy all personal letters soon after reading them. He then gave the contents of this particular letter, repeating the words in which the complainant had made the request, and also the reason she had given for making it. On his cross-examination his attention was called to the fact that in his affidavit, read on an application for alimony, he had sworn that the complainant's request had been made verbally, at his store in Hudson street, in the city of New York, and not by letter, and was then asked which statement was true. He answered that the request was made either by letter or verbally, and that if his affidavit stated that it had been made verbally, that "that must be the correct solution of the matter." On further cross-examination he said that his recollection about the matter was indefinite, and that he could not swear either way whether the request had been made verbally or by letter. And yet, when this request and his act in pursuance

Clark *v.* Clark.

·of it, and the relation in which these parties stood to each other at the time the request was made, are remembered and consid-·ered, it would seem to be almost beyond belief that even the most trifling incidents of such an affair should not have impressed themselves so deeply upon his memory that he could never forget them. This would unquestionably have been the ·case if it had been true that a pregnant woman, who knew she was not his wife, and whom he knew was not his wife, had requested him to address his letters to her as his wife, and he had been weak enough to comply with her request. One thing I think must be regarded as absolutely certain : If his evidence on this point is true, his memory is so utterly untrustworthy that no ·confidence can be reposed in his recollection, especially when his recollection differs from that of the complainant.

Nor can I believe that the reason which the defendant gives for addressing this letter to the complainant as his wife, is the ·one which actually existed in his mind when he wrote the letter ·and guided his hand in directing it. He says he did it without ·any thought of the consequences, and simply with a desire to do what the complainant wanted him to do. He further said that when the complainant requested him to address her as his wife, ·she informed him that she had told her parents and friends that he and she were married, and then said that she wanted to keep her reputation, but could not do so unless he addressed her as his wife. After making this statement, this question was put to ·him, "Then you were willing to address her in this way, so that ·her parents and friends would think that you were married?" His answer was : "I was willing to do anything to aid her; I didn't care how I addressed her; I was willing to do anything that would satisfy her." Now, in deciding whether the least credit can be given to this evidence, it is necessary to observe that when the complainant informed the defendant that she had ·told her parents that he and she were married, he does not pretend that he accused her of falsehood, or that he said anything which indicated that he disputed the truth of the statement she had made to her parents, or that he was dissatisfied with or dis-·approved of what she had done. And in this connection it is

Clark *v.* Clark.

important to notice that the very first act the defendant did, in his intercourse with the complainant after he knew that the complainant's parents had been informed that he and she were husband and wife, was an act which expressly and positively affirmed the truth of the statement.

But, again, in testing the truthfulness of the defendant's evidence on the point under consideration, it is necessary to call attention to the fact that his description of the complainant's conduct and of the relations which had existed between them for years prior to the time when she requested him to recognize her as his wife, render it almost absolutely certain, if the complainant was as lewd and abandoned as he says she was, and he was as free from the least duty or obligation to her as he says he was, that unless he differs widely from other men of ordinary sense and prudence, it would have required something much more persuasive and powerful than a mere desire to aid or satisfy her, to induce him to do anything which would enable her to prove that a falsehood which she had circulated against him was the truth. He swore that the complainant and he had their first sexual intercourse in open daylight, in his father's house, within two or three months after he made her acquaintance, and that the complainant's conduct on that occasion was so immodest and dissolute as to be equivalent to a shameless solicitation to him to seize her person and use it; that from that time forth they had sexual intercourse whenever he was at his father's house, without any talk about marriage or thought of marriage on his part, and that nothing was ever said about marriage, by either to the other, until after the complainant became pregnant, but after that the complainant repeatedly asked him to marry her, and that he on each occasion resolutely refused. Just at this point it is necessary to refer again to what the defendant swore passed between the complainant and himself in their interview in August, 1891. He at first testified, it will be remembered, that she asked him to marry her publicly, and then changed his testimony by testifying that she had not used the word "publicly," but had simply asked him to marry her. He also swore that, in reply to her solicitation, he had told her that he would not

Clark v. Clark.

marry her, and that the best he would do for her was, if she would come to New York to be confined, he would see that she was taken care of during her confinement and afterwards take the child, and that she replied rather than do that she would commit suicide.   Now, it appears to me, when one part of the defendant's evidence, just summarized, is contrasted with the other, that no doubt whatever can exist in any discriminating mind, that either his description of the complainant's conduct, the criminal character of their relations and the attitude he constantly assumed towards her, is a cruel fabrication or that the reason he gives for his recognition of her as his wife is false.   I cannot believe that any man, possessing sufficient mind to be able to take care of himself, had, when entirely free from duress, been induced, simply by a desire to please, to deliberately acknowledge a woman as his wife, whom he had repeatedly refused to marry and whom he knew to be entirely destitute of both virtue and modesty.

The truth of the complainant's evidence as to the fact of marriage is also confirmed by oral admissions made by the defendant under circumstances which make it very difficult, if not impossible, to believe that he did not speak the truth.   The complainant's child was born November 26th, 1891, in the house of the defendant's father at Lebanon.   A few days after its birth the physician who attended the complainant in her confinement wrote to the defendant, informing him that he had delivered his wife of a son, and enclosed his bill.   The defendant received the letter, but did not reply.   He neither wrote to the physician nor to the complainant.   Neither did he visit the complainant nor do anything for her.   About three weeks after the birth of the child, the complainant, accompanied by Miss Mary E. Sheets, went to New York to see the defendant to ascertain the cause of his neglect and inattention.   They found him at the store where he was employed.   From there he took them to the Cosmopolitan Hotel for dinner, and then went with them to Macy's store on Fourteenth street, and from there to the depot of the New Jersey Central railroad at Communipaw, where he put them on a train for Lebanon.   Miss Sheets swears that, at three

different times on that day, the defendant, in reply to questions·
put by her to him, admitted that the complainant and he were
married, and also stated that he intended to take the complain-
ant to his home in New York. In narrating what was said
when she first put the question to him, Miss Sheets testified as
follows:

> "I told him that I wanted to know if they were married, for some of the
> people out at Lebanon said that they did not believe they were, while others·
> said they did. He said, 'We are married.' Then I said, I want you to tell
> me the truth, so that I can go home and tell the people. He said, 'We are
> married and you can tell them so.'"

She also testified that the defendant on that day said the same·
thing twice afterwards. The defendant admits that Miss Sheets·
put the questions to him which she swears she did, and that he·
answered them, but he says that he invariably answered in this·
way : "Ask Lucy, she can tell," or "she knows." He further·
said that after making this answer "nothing further in particular
was said," either by Miss Sheets or himself, and that at neither·
time, when he gave this answer, did Miss Sheets say that Lucy·
had already told her that he and she were married. And yet·
that was the fact. At least three months before Miss Sheets·
had her interview with the defendant, the complainant had told
Miss Sheets of her marriage and made known to her the circum-
stances attending its celebration. This being so, it cannot be·
believed that if the defendant had answered Miss Sheets in the·
way he says he did, that Miss Sheets would not at once, under
the pressure of an irresistible impulse created by his words, have·
said, "Why, Lucy has already told me—she says you are mar-
ried." Those or similar words would undoubtedly have leaped
from her lips as the natural and unrestrainable response to such·
answers as the defendant says he gave. But if his answers were·
what Miss Sheets says they were, then there was no reason why·
anything "further in particular should be said," and that, it will
be·remembered, was the fact according to the defendant's testi-
mony, namely, that after he answered Miss Sheets' questions·
"nothing further in particular was said." The defendant, when·

Clark *v.* Clark.

asked to give the reason why he did not answer Miss Sheets' questions according to the truth, as he now claims the truth to be, and say to her plainly that the complainant and he were not married, answered that he did not know that he was bound to lay himself open to Miss Sheets' criticism and go into details with her. That may have been so, but it must have been perfectly plain to the defendant that if he answered the questions at all, his honor and his duty to himself, as well as his duty to the complainant, required him to speak the truth. He was in a position where he could not avoid seeing, if he believed what he now says is the truth, that he would best shield himself against a false claim of marriage, by a dissolute woman, by declaring the truth boldly, without quibbling or evasion. I believe that he did tell the truth, and that he gave the answers which Miss Sheets swears he did. This, I think, is strongly confirmed by the general course of the defendant's conduct as described by himself.

There are other facts in evidence, the effect of which is to confirm, to a greater or less extent, the truth of the complainant's evidence. I shall not mention or discuss them. This opinion is already too long. In addition to what has already been said, I shall content myself with simply saying that a full and careful consideration of the entire evidence has resulted in putting my mind as completely at rest, as to the vital fact of the case, as it can be in any case where the evidence in proof and disproof of such fact stands in as sharp conflict as it does in this.

The complainant is entitled to a decree, with costs.

I add—not, however, as a part of my opinion, but for the information of the parties and their counsel—that an allowance will be made to the complainant of $340 a year, payable quarterly in advance, in sums of $85 each. The decree will direct that the defendant shall give security.