Mullaney *v.* Mullaney.

PAULINE E. MULLANEY, respondent,

*v.*

GEORGE W. MULLANEY et al., appellants.

[Filed March 4th, 1903.]

1. The orphans court has no original jurisdiction to determine whether a wife's release of her interest in her husband's estate has been obtained by fraud. Its decision on the question was *coram non judice,* and its determination worked no estoppel.

2. In a proceeding by a wife for appointment as her husband's administratrix, under a statute providing that administration shall be committed to the widow or next of kin, the issue whether her release of her interest in the estate was procured by fraud was, if at all, only incidentally cognizable, and its decision thereon was therefore not *res judicata.*

3. Evidence in a suit by a widow to set aside, as procured by fraud, her release of all interest in her husband's estate, examined, and *held,* to sustain complainant's contention, and to show that the person perpetrating the fraud, though previously her agent, was at the time acting for heirs adversely interested.

On appeal from a decree advised by Vice-Chancellor Stevens, who delivered the following opinion:

This is a suit to set aside a release given by the complainant, who claims to be the widow of Michael Mullaney, to defendants, who· are his next of kin and heirs-at-law. That the case may be understood, it will be necessary to state the situation as it was prior to the giving of the release. Michael Mullaney died intestate, at Bayonne, December 2d, 1899. He left personal property estimated at $7,297.29 and real estate estimated at $6,400. At the time of his death Mrs. Mullaney was not living with him. She says that on July 4th, 1862, it was agreed, in the city of New York, that they should become man and wife. There was no marriage ceremony, but the undisputed fact is that after that time they lived together for

Mullaney v. Mullaney.

about twenty years, and, most of the time, in Bayonne. Then she left him, as she alleges, because of his cruel treatment, and went to Newark, where she has since resided. For nearly twenty years she has been supporting herself at domestic service or by working out by the day.

When Michael died she applied for letters of administration. This was resisted by Michael's next of kin, on the ground that she was not in fact his widow. The case was heard by the Hudson county orphans court. A large number of witnesses were sworn on both sides. On February 2d, 1900, the last witnesses were called and the case summed up. The court reserved its decision. Three days thereafter the release in controversy was procured. On February 9th, application was made to the orphans court to open the case in order that the release might be put in for the purpose of showing that Mrs. Mullaney had no further interest in the estate, and that consequently she was not a proper person to administer. The paper did not, in terms, contain any waiver of her right to do so. It only released her right, title and interest in and to the estate, real and personal, of her late husband. The application was resisted, but the court granted it, and then counsel for the widow asked to be permitted to show that the release was obtained by fraud. The court granted the request, and thereupon evidence was given on both sides on this new issue. The decision, as appears by the judge's opinion, but not by the order or decree, was that there was no fraud, and that this being so it was unnecessary to decide any other question. The order was that the prayer of the petitioner asking for administration be denied. Then Mrs. Mullaney filed this bill, and the case coming on to be heard it was stipulated that the evidence taken in the orphans court should be used here. No additional evidence, either on the question of marriage or of fraud in procuring the release, was taken in this court.

I shall deal with the first of these questions very briefly. It seems to me very plain that while there was no ceremonial marriage, the connection was matrimonial, and not meretricious. In addition to the evidence of Mrs. Mullaney that there

was a verbal agreement of marriage, the following facts appear: Michael Mullaney kept a grocery and liquor store in Bayonne. He was also for many years postmaster. During the twenty years that he and Mrs. Mullaney lived together they regarded each other and were treated by their customers and by their friends and relatives as man and wife. In their correspondence, some of which is in evidence, they recognized each other as such. There was one child born to them—a son, who died when about eight years old. The inscription over his grave was as follows:

"Our little Simey—Simon K., son of Michael and Pauline Mullaney, died March 23, '73, age 8 years, 3 mos. and 10 days. Sleep on my babe and take thy rest. God called thee home. He thought it best. Selected by his grandmother."

After the separation he told the witness, Frank Hovell, that he could not sell the lots because he could not get his wife to sign off. The defendant's witnesses, in so far as they do not corroborate complainant's witnesses, apparently draw their conclusion that the cohabitation was *illicit* only from the admitted fact that there was no ceremonial marriage. The evidence shows that there was an interchange of consent and that this was followed by cohabitation, accompanied with matrimonial habit and repute.

The important question to be determined is whether this court should avoid the release for fraud.

An objection was made *in limine* that this question, having been decided by the orphans court, became *res adjudicata* and not re-examinable here. I think there are two answers to this objection—*first*, the orphans court had no jurisdiction to decide the question; *second*, if it had, its decision thereon was not conclusive for the reason that the point decided was only incidentally cognizable.

The jurisdiction of the orphans court is limited to those matters which have by statute been confided to it. It has no inherent jurisdiction to decide whether a release of lands or personal property is voidable for fraud. The utmost that can

be claimed is it may determine questions of law and equity, the decision of which is necessary to the decision of some other matter expressly committed to it (*Dunham* v. *Marsh, 7 Dick. Ch. Rep. 261*), just as this court may decide *legal* questions when they arise incidentally and collaterally in a suit rightly instituted for equitable relief. *Kean* v. *Union Water Co., 7 Dick. Ch. Rep. 813.* The orphans court had power to decide the question whether Mrs. Mullaney was in fact the widow of Michael Mullaney, for letters of administration could only be granted to her on this foundation; and if the question were in doubt it would, necessarily, hear proof on the subject. But if that court could perform its statutory duty without trying questions properly cognizable by some other tribunal, it would be without jurisdiction to pass upon them. Thus it has been held in several cases, that when an administrator makes application to sell lands to pay debts, the estate not being insolvent, the orphans court has no power to determine the *validity* of the claims in respect of which the administrator bases his application. The determination under our system belongs to other courts. *Miller* v. *Pettit, 1 Harr. 421; Vreeland* v. *Schoonmaker, 1 C. E. Gr. 512; Smith* v. *Smith's Administrator, 12 C. E. Gr. 445; Middleton* v. *Middleton, 8 Stew. Eq. 115.* It has also been held that where the estate is not insolvent the orphans court has no power to adjudge that a creditor has, by inequitable conduct, discharged it from liability to him. *Partridge* v. *Partridge, 1 Dick. Ch. Rep. 434; 2 Dick. Ch. Rep. 601.* Now, there is no more reason why the orphans court should have assumed jurisdiction to try the validity of the release under consideration than there would be for a court of law, in an action of ejectment, to adjudge whether the deed under which grantee claimed was obtained by fraudulent misrepresentation. The law court would adjudge in accordance with the legal title and would leave the grantor, in the case supposed, to his remedy in equity, and so, in like manner, the orphans court should have assumed that the release was valid until it was decreed by this court to be fraudulent and void. It was proper for it to have received the release as a valid instrument

and to have given it such weight as it was entitled to in determining the question of administration. . The orphans court had before it the evidence on which to decide whether Mrs. Mullaney was or was not Michael's widow. It had proof of who were next of kin. It had, too, Mrs. Mullaney's release. It was therefore in a position to decide to whom, under the then existing circumstances, administration should be committed. It is true that subsequent litigation in another tribunal might have varied the rights of the parties as they then appeared to be, but this was only a not uncommon instance of a right ascertained by one tribunal, acting within its sphere, being subsequently modified by the decision of another tribunal acting also within its sphere. In other words, the mischief, if mischief it was, arose out of the fact that, such is the complexity of human affairs, it has been found convenient, if not necessary, to apportion the judicial work of the state among the several courts instead of giving to any one unlimited jurisdiction to deal with every phase of every subject that might come before it. The proceeding·to determine the fraudulent character of the release was therefore *coram non judice* and the determination worked no estoppel.

If I had come to the conclusion that the court had jurisdiction to determine the question of fraud, I should still have thought that its determination would not have been conclusive. Lord Chief-Justice DeGrey thus expresses himself in the leading case of the Duchess of Kingston: "From the variety of cases relative to judgments being given in evidence in civil suits, these two deductions seem to follow as generally true—*first,* that the judgment of a court of concurrent jurisdiction directly upon the point is as a plea, a bar and as evidence conclusive between the same parties upon the same matter directly in question in another court; *secondly,* that the judgment of a court of exclusive jurisdiction directly upon the point is in like manner conclusive upon the same question between the same parties coming incidentally in question in another court for a different purpose. But neither the judgment of a concurrent or exclusive jurisdiction is evidence of any matter which came col-

laterally in question, though within their jurisdiction, nor of any matter incidentally cognizable, nor of any matter to be inferred by argument from the judgment." ·

It seems to me that the question resolved by the orphans court, if cognizable at all, was only incidentally cognizable, and only to be inferred by argument from the order actually made. The statute says the administration shall "be committed to the widow or next of kin of the intestate." Under ordinary circumstances, it is usually confided to the widow. *Wms. Ex.* *363. Had the question been only whether Mrs. Mullaney was the lawful wife of Michael Mullaney, its adjudication would, according to most of the cases, have bound this court. Lord Lyndhurst so held, in *Barrs* v. *Jackson, 1 Phil. 582,* with respect to the analogous question of who was next of kin, reversing the contrary decision of Vice-Chancellor Knight Bruce, reported in *1 Younge & C. 587.* The weight of English and American authority is said to be in favor of the view taken by Lord Lyndhurst. *Duchess of Kingston's Case, 2 Sm. Lead. Cas. (6th Am. ed.)* *681. The present case does not call for a decision on the point. The question whether Mrs. Mullaney was or was not Michael Mullaney's wife, would, under ordinary circumstances, have gone to the very heart of the controversy. An issue could have been framed upon it; but the question of release or no release could never have become an issue in the proper sense of that term. If her allegation was, "I am widow," and this was proved, then the allegation by way of confession and avoidance would be, not "you have executed a release," but "you, though widow, are without interest," and so not entitled to your statutory right. Want of interest would be the issue, and of this the release would be evidence. It would have been quite beyond the power of the orphans court to have decreed that the release should be avoided for fraud. The judgment in the case at bar was only "that the application of Pauline E. Mullaney for her appointment as administratrix be and the same is denied, and her petition be dismissed, with costs."

It seems to me clear, therefore, that the question of fraud

or no fraud, had the court been competent to try it, would have been collateral. It would be strange, indeed, if this court could be estopped by the inference of an adjudication which the court neither actually made nor was competent to make. *Hibshman* v. *Dulleben, 4 Watts 183,* is a case in point. It was there held that a decision by the orphans court that a legatee was precluded from excepting to an account filed by an executor by a release of the legacy did not debar him from proving that the release was procured by fraud in a suit for the legacy. A judgment is not conclusive and is no evidence as to facts not in issue in the action, but proof of which is given therein to establish facts in issue. *Belden* v. *State, 103 N. Y. 1.*

Suppose Mrs. Mullaney, instead of assigning her interest to the heirs and next of kin, who happened to be parties to the orphans court proceeding and to the present proceeding, had assigned to a stranger? Her lack of interest would be the same. Could the question of fraud have been tried by the orphans court in the absence of the assignee? Certainly, it would not be asserted that that court could have brought him in by process and made a decree which would have bound him.

I now proceed to a consideration of the merits. On this branch of the case the material facts are these: On the day of Mr. Mullaney's funeral, at which his wife attended, she had a conversation with one Alexander Martin, who describes himself as a general auctioneer and collector. As the result of it he took her to William Salter, an attorney practicing in Jersey City. Salter made application in her behalf for letters of administration, and conducted the proceedings on the caveat. Evidence was taken in open court, on January 5th, 1900, and on several days thereafter up to and including February 2d. Great diligence in procuring witnesses seems to have been displayed on both sides, and during all this time Martin acted as a messenger and process server for Salter, and appears to have had, by arrangement with him, a contingent interest in the result. Salter himself, it is said, was to have had one-half the proceeds of the recovery. The case was argued and submitted to the court on the 2d of February. Mrs. Mullaney

was present.    Now, I think that all who heard the evidence must have been greatly impressed with the strength of Mrs. Mullaney's case.    That Martin must have great confidence in it cannot be doubted, and, in fact, he himself admits it.    Notwithstanding, what he did, was this:    The argument had taken place on Friday.    On Sunday afternoon he started for Newark to see a man named Erwin, who wanted to buy a horse.    I shall give his version of what took place in some detail, for I think its inherent improbability will be apparent from his own statements.    After he reached Newark it occurred to him, as he testifies, that it was his duty to go and see Mrs. Mullaney. Somewhat incongruously he adds, "I went to see her for no purpose whatever."    As the trolley car had carried him one or two blocks from Erwin's place, he decided not to go there, although he had expected to make money by the trade he was contemplating, but to go direct to Mrs. Mullaney's.    He went there and found her "in a horrible condition."    She told him that the neighbors were shouting at her—that a Mrs. Brown was telling her that she was trying to be a white man's wife; that the Farrell people were around the streets nights trying to get evidence; that she wanted to move and that she said to him, "Aleck, you have got me in all this trouble; get me $100 and you will never hear from me again."    He says that he told her he did not see how he could get any money for her; but that she kept at him all that afternoon, so that he neglected to see Erwin about the horse.    Then he says:

"I made up my mind before I left the house that I would settle the case, no matter what I got, and I told her I would go over to Bayonne and ask a man named Smith, who is a brother-in-law of Mullaney's, for $300.    She said 'the d—— entire Mullaney family has not $300.'    I said I would just as leave ask them for $300 as I would for $100, and I'll do it; and she says if I get $300, I will give you one."

He then told her that if he got the money he would telegraph for her to meet him at the corner of Broad and Market streets, Newark, and she said, "I will not go to Market and Broad streets; I don't want to meet those Farrells."    She then suggested the Elizabeth depot, in Elizabeth, and he said all right

as to the place and that he would telegraph her.   On cross-examination, he says that he thinks that it was he who mentioned the Central railroad depot, and not she.   He then went to Smith's house, in Bayonne, reaching there after eight that same Sunday evening.   On the way it occurred to him that he might as well ask Smith for $400.   Accordingly he asked Smith for that amount, and said, "I wanted the money early to-morrow morning."   Smith told him that they should go to George W. Mullaney, as he was an heir indirectly only, and Martin replied that he would not go to him.   Then Martin said to Smith, "I'll give you an hour and a half to let me know what you will do."   Smith thereupon proceeded to see Mullaney, and Mullaney at once agreed to the $400.   After that Smith went to a Dr. Forman, who agreed to go to Elizabeth the next morning with the money.   After seeing these two gentlemen, Smith went to Martin's house and told him that they would pay $400.   Less than two hours elapsed from the time Martin first saw Smith to the time when the arrangement was completed.   Next morning Martin went back to Mrs. Mullaney, without communicating with Mr. Salter, her solicitor, or Mr. Linn, her counsel.   He reached her house between seven and eight o'clock, and took her from Newark to the Central railroad depot in Elizabeth.   In the meantime Forman had received from Smith, at Bayonne, $400, $300 of which was made up of three $100 bills, and reached the Elizabeth depot between nine and ten o'clock.   From there, Forman, Martin and Mrs. Mullaney proceeded to the office of Frederick Marsh.   Mr. Marsh had had nothing whatever to do with the case, but, under Dr. Forman's instructions, he prepared a release, expressed to be for the consideration of $1, which Mrs. Mullaney signed.

It may be remarked, in passing, that this release is noticeable, not only because it fails to express the true consideration, but because it contains no less than fourteen grantees, whose names, including their middle names, are given in full, with their respective places of residence in New Jersey and in different towns in the State of New York.   Dr. Forman's version of

Mullaney *v.* Mullaney.

how he executed his errand is that he received the $400 from
Smith, who said that he was to go to Elizabeth and procure a
good lawyer and get a release from the woman, and that he was
to use the money to get the job done. When asked to whom he
was to give the $400, his reply was, "I suppose to whom it be-
longed." When asked "Who was that?" he says, "I suppose
this woman, for she signed that release." Notwithstanding this
supposition, he says he gave her $300, paid the fee of Mr.
Marsh ($10) and gave Martin the balance ($90). "I supposed
if the woman got that $300, Martin was entitled to the bal-
ance." It does not appear that from the beginning to the close
of this transaction Mrs. Mullaney was directly informed of the
precise amount of the settlement. The paper, which Mr. Marsh
read over and explained the effect of to Mrs. Mullaney, was
delivered to Dr. Forman. It is a complete release of all
Mrs. Mullaney's right, title and interest in all her husband's
lands and personal property, said to be worth over $13,000.
One or two days afterwards Mr. Salter was notified that appli-
cation would be made to reopen the case, for the purpose of
introducing in it evidence. This was the first notice that Mrs.
Mullaney's counsel had of its execution.

Mrs. Mullaney's account of her meetings with Martin differs
essentially from his. She says that he came to her house on
Sunday afternoon, and told her that he had good news for her;
that the case had been settled and that her lawyer, Salter, had
sent word to her that she should go to Elizabeth and sign a
paper; that she asked him how much she was to get and that
he said about $300; that her reply was that that was very little
for her to get; that her lawyer had said that she would get ten
times that, and that he answered that Salter had done the best
he could and she should be satisfied; that Mullaney had drunk
up and used up his money with women, and that his relatives
had robbed him to such an extent that the estate had all gone
down; that he told her that the other heirs would only get $98
apiece. Mrs. Mullaney is corroborated in this version of the
interview by a colored man named Holmes, who lives in the
same house with her, and was present at the conversation. It is,

on its face, so much more probable than Martin's version that I have no doubt of its substantial accuracy. To suppose that Martin, a horse-dealer and auctioneer, was so moved by Mrs. Mullaney's tears and entreaties that he was compelled to take a course which he knew was contrary to her pecuniary interest and his own, in a case which he admits he believed to be a good one, and to take this action so hastily that he did not find time to consult her own counsel, who lived in the same town with him, quite transcends belief. There must be another explanation of his conduct. That he is unscrupulous, appears from his own evidence; that he is unworthy of belief, appears from the testimony of his neighbors. I have no doubt that he went to Newark that Sunday afternoon because of some understanding with some one representing the interests of the heirs. He had shortly before discovered that Salter, in the written agreement which he had made with his client in reference to his contingent fee, had not mentioned him, and he doubtléss thought that because he would not have hesitated to take an unfair advantage of Salter, as in fact he did, Salter might be willing to take an unfair advantage of him. He no doubt came to the conclusion that it would be more certainly profitable to him to go over to the other side. This, of course, is largely conjecture, but conjecture not only resting on its inherent probability, but also on evidence. He afterwards said to Salter's clerk, Spofford, in explanation of his conduct, he could not see any money on Salter's side and so he went over to the other side, and he said to Salter, if Salter is to be believed, "I guess I am the best heir now; you get your $1,400 first [alluding to an offer of settlement which Salter had made to the heirs] and I will show you dollar for dollar."

I have said that it is probable that Martin went to Newark in consequence of some understanding between himself and some one representing the interest of the heirs. Smith and George Mullaney both deny that they had any such understanding. Their testimony may be, and very probably is, literally true; but they are only two of the fourteen persons interested. Martin's testimony is that when he started to go to Newark on that

Sunday afternoon he intended to see Erwin about a horse and did not intend to go to Mrs. Mullaney's. He is diverted from this purpose only because the trolley car had carried him a block or two beyond Erwin's house. He goes to Mrs. Mullaney's "for no purpose whatever." He finds her "in a horrible condition," notwithstanding the fact that the excitement of the trial was over and the evidence appeared to be very favorable to her. He reaches Smith's house, in Bayonne, after eight o'clock in the evening. Between that and ten he not only concludes the bargain, but Smith sees George Mullaney and gets his consent to it, and Mullaney or Smith gets Dr. Forman's consent to go to Elizabeth early the next morning. There is no bargaining over terms; the $400, $300 of which were in $100 bills, are in readiness for the consummation of the affair before the banks opened on Monday morning. Where this money came from, or how Smith happened to have so much money at hand in such large notes, does not appear. The most singular fact of all is that no one, on either side, suggested that the transaction should be consummated with the assistance of the counsel engaged in the case. In this regard the only explanation that suggests itself is that the representatives of the heirs were unwilling to let the high-minded gentlemen who were conducting their case in court know what was going on. They doubtless feared that if they were informed of it they would insist that the settlement should be made by Mrs. Mullaney under the advice of her own counsel and that this would defeat their purpose, and so it was arranged that the settlement should be made in another town, in the office of a lawyer who was ignorant of all the important facts. If the transaction was an honest transaction, there was absolutely no reason why it should not, and would not, have been consummated in the office of Mr. Hughes or Judge Hudspeth. There was every reason why it should.

Again, why all this haste? Was it not feared that even if the consummation of the plan were delayed for a few hours, it might become impossible? Another significant circumstance, indicative of collusion, was the place of meeting, viz., the Central railroad depot in Elizabeth. Martin, in his direct evidence,

swore that this place was suggested by Mrs. Mullaney, but on cross-examination this must have appeared to him so unlikely that he finally said that he had himself suggested it. Why he did so is obvious. It was accessible from Bayonne and it was out of the way. That he would have fixed that place and that early hour on the morning of the next day unless there had been some previous understanding, is not probable.

The rule of law applicable is clearly stated by Mr. Justice Magie, in delivering the opinion of the court of appeals in *Dundee Chemical Works* v. *Connor, 1 Dick. Ch. Rep. 582.* He says: "Courts will not weigh the relative skill of parties to contracts and merely from a disparity between them avoid a contract obtained from the less skillful party. It is only when the contract is got from the illiterate, the weak-minded or distressed party under circumstances which indicate that it was procured by artifice or deception, or by undue pressure and importunity inducing action without advice or time for deliberation, or by advantage taken of distress, or for no or an inadequate consideration, or is otherwise inequitable, that it will come under condemnation. Therefore, when a disparity of capacity appears courts should scrutinize the transaction with extreme care. But if, when so examined, there is disclosed no ground of objection, except such disparity, the contract cannot be impeached."

Every element mentioned by Justice Magie as ground for avoidance seems to be present in this case. The artifice of Martin in representing himself as coming from Salter; the deception which he practiced when he told her that her case had been settled; that the estate had been found to be dissipated, and that it was Salter's advice to her to sign the release; his importunity, inducing action without advice or deliberation, and an inadequate consideration, are all obvious. It is said, however, that conceding this to be so, Martin was Mrs. Mullaney's agent, and the heirs are not responsible for his misconduct. I do not so read the facts. I think the evidence shows, not only that the heirs are seeking to hold an advantage which Martin's fraud has given them, but that their representatives, or one or more

of them, took some part in promoting the scheme.   Martin, in this transaction, appears to have acted for himself and for them, and not for Mrs. Mullancy.   She still has the money and offers to return it.

There is some evidence tending to show that since she left her husband she has been living with two colored men.   This evidence is controverted and the matter is left in doubt.   As I view the case, it has little to do with the decision of the present controversy.   It may become of consequence hereafter, when she sues for her dower.

*Mr. Charles L. Corbin,* for the appellants.

*Mr. Clarence Linn,* for the respondent.

PER CURIAM.

The decree appealed from is affirmed, for the reasons stated in the opinion of Vice-Chancellor Stevens in the court below.

*For affirmance*—THE CHIEF-JUSTICE, VAN SYCKEL, GARRISON, FORT, GARRETSON, HENDRICKSON, PITNEY, BOGERT, VREDENBURGH, VOORHEES, VROOM—11.

*For reversal*—DIXON—1.