"The parties to this suit were born in Galicia, then and thereafter, until the treaty of Versailles was consummated in the year 1918, a province of the monarchy of Austria-Hungary. In February of the year of 1906 they went through a ceremony of marriage to each other, which was performed by a rabbi of the Jewish faith in that province. At that time and until the year 1918 there was in force and effect in Galicia a code of civil laws which prescribed certain formalities to be observed in the performance of such marriage ceremonies, including an announcement of the proposed marriage in the synagogue or place of prayer, the certification to the rabbi designated to perform the marriage that such announcement was duly made, the appearance of the parties before the rabbi with proof of their capacity to become married, *Page 581 
a solemn declaration of the marriage by the rabbi, a written return by the rabbi to the recorder and an entry of the return in the official records.
"The proofs offered by the defendant indicate that the banns were not published in this case, nor the registration made, as required by law. Because of these omissions he contends that his marriage to the complainant is absolutely void under a section of the civil code aforementioned, that the marriage being invalid where performed is invalid everywhere, and that complainant's bill must be dismissed, because she has failed to prove a valid marriage to the defendant. This section of the code (section 70) provides in effect that the omission of any of the prescribed ceremonial formalities will render the marriage infirm, but neither this section nor any other section of the code defines the extent or the legal effect of such infirmity.
"That the parties intended that their marriage should be valid and binding is beyond doubt. There was no attempt at secrecy. A written ante-nuptial agreement was executed by the parents of the respective parties. The rabbi who performed the ceremony was the rabbi regularly attached to the synagogue at which complainant and her parents were regular attendants. The ceremony took place at an inn about fifteen blocks distant from complainant's home. On the day of the marriage both parties attended with their parents, relations and friends. There were upwards of one hundred guests. There were music, dancing and refreshments, followed by the ceremony of marriage with all of the requirements prescribed by the Jewish ritual.
"After the ceremony the parties lived together in Galicia as husband and wife. Complainant's father paid to defendant a sum of money as a dowry for his daughter. On February 3d 1907, a daughter was born to them. All of the requisites of a valid marriage are shown, save only the omission of statutory directions for its publication and registration: there was a contract per verba de prasenti, followed by cohabitation and the birth of issue, and there is ample proof of habit and repute. *Page 582 
"In October, 1907, the defendant emigrated to the United States, leaving complainant and their daughter in Galicia to await his summons to join him in this country. When he arrived in the United States he was befriended and given a start by an uncle of complainant, who lived in New York City, and shortly thereafter became domiciled in New Jersey. He wrote complainant affectionate letters and sent her money. He became a naturalized American citizen and in his application made affidavit that complainant was his wife. He finally sent money to complainant in order that she and their daughter might join him here, but when they arrived at Ellis Island in June, 1913, the defendant had a sudden change of heart. He failed to meet them and endeavored to procure their deportation, and from that time to the present has consistently repudiated complainant, ignored her and sought to rid himself of her. He never cohabited with her after leaving her in Galicia in October, 1907.
"All of the statutory conditions are conceded to exist which entitle complainant to relief in this suit, except the fact of marriage.
"While the fact of marriage is jurisdictional, nevertheless, if a marriage ceremony be proved to have been performed even though it be defective because of the lack of some statutory requirement, yet it will be presumed to be valid and the burden will be on the defendant to overcome this presumption by proof that the marriage is void.
"It is a general principle of international and interstate law, subject to but few exceptions, that the validity of a marriage, so far as it depends upon the preliminaries and the manner or mode of its performance or solemnization, is to be determined by reference to the law of the place where it was performed or solemnized.
"The general rule of law is that a marriage valid where it is performed is valid everywhere; and the converse of this proposition, that a marriage void where it is performed is void everywhere, is equally well settled. Harral v. Harral, 39 N.J. Eq. 279,287; Clark v. Clark, 52 N.J. Eq. 650; Schaffer v.Krestovnikow, 88 N.J. Eq. 192; Bolmer v. Edsall, *Page 583 90 N.J. Eq. 299; Capossa v. Colonna, 95 N.J. Eq. 35; affirmed,96 N.J. Eq. 385; Huard v. McTeigh, 113 Or. 279;232 Pac. Rep. 658; 39 A.L.R. 528; Great Northern Railway Co. v. Johnson,254 Fed. Rep. 683; 166 C.C.A. 181; Young v. Young, 213 Ill. App. 402; Acklin v. Employes' Benefit Association, 222 Ill. App. 369; In re Wells, 123 App. Div. (N.Y.) 79; affirmed, 194 N.Y. 548.
"The rule that a marriage invalid where performed is invalid everywhere is subject to certain exceptions, such as marriages celebrated in foreign countries by citizens entitled to the benefit of the laws of their own country. Phillips v. Gregg
(Pa.), 10 Watts 158; Canale v. People, 177 Ill. 219;Travers v. Reinhardt, 205 U.S. 423.
"But so far as the validity of a marriage depends on the preliminaries or the manner or form of solemnization, the parties being domiciled in the jurisdiction where the marriage was performed, there seem to be no exceptions to the rule that thelex loci contractus governs. Smith v. Smith,52 N.J. Law 207, 213; Note to Hills v. State, 161 Neb. 589; reported in57 L.R.A. 155; Ollschlager's Estate v. Widmer, 55 Or. 145;105 Pac. Rep. 717; Reifschneider v. Reifschneider, 241 Ill. 92;89 N.E. Rep. 255; Sottomayer v. De Barros (L.R.), 5 Prob.Div. 94; 5 Eng. Rul. Cas. 814; Simonin v. Mallac, 2 Swab. T. 67.
"Yet a ceremony of marriage, such as is proved in this case, whether in due form or not, must be presumed to be valid and binding, unless the contrary clearly appears. This presumption of legality is expressed in the text of 1 Bish. Mar., D. S.
§ 956, as follows:
"`Every intendment of the law leans to matrimony. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a strong presumption of its legality, not only casting the burden of proof on the party objecting, but requiring him throughout, in every particular, to make plain, against the constant pressure of this presumption, the truth of law and fact that it is illegal and void. So that this issue cannot be tried like the ordinary ones, which are independent of this special presumption. And the strength of the presumption increases with the lapse of time through which the parties are cohabiting as husband and wife, it being for the highest good of the parties, of the children and of the *Page 584 
community, that all intercourse between the sexes in form matrimonial should be such in fact, the law, when administered by enlightened judges, seizes upon all probabilities and presses into its service all things else which can help it in each particular case, to sustain the marriage and repel the conclusion of unlawful commence.'
"In Sparks v. Ross, 72 N.J. Eq. 762; affirmed, 73 N.J. Eq. 735,
the evidence disclosed a ceremonial marriage followed by a cohabitation of the parties as man and wife for over fifteen years, the birth of children and the termination of the relationship only by the death of the husband. Vice-Chancellor Leaming held that this raised a powerful presumption of the legality of the marriage based upon `the motives which govern human conduct and on the policy lying at the base of our social system,' and pointed out that the conclusion of illegality involved the assumption that the parties had exposed themselves to the penal consequences of illegal acts and operated to bastardize their offspring.
"In Schaffer v. Krestovnikow, 88 N.J. Eq. 192, 523;affirmed, 89 N.J. Eq. 549, Vice-Chancellor Backes said: `The proof of a ceremonial marriage and the fact that petitioner and defendant lived in apparent matrimonial relation for fifteen years, raises a strong presumption of the legality of their marriage, and this presumption can only be overcome by clear and conclusive evidence * * *." See, also, Keller v. Linsenmyer,101 N.J. Eq. 664; Rooney v. Rooney, 54 N.J. Eq. 231; Vreeland
v. Vreeland, 78 N.J. Eq. 256; Sparks v. Ross, 79 N.J. Eq. 99;affirmed, Ibid. 649; Michaels v. Michaels, 91 N.J. Eq. 408;Tyll v. Keller, 94 N.J. Eq. 426.
"This presumption in favor of the legality of a marriage is one of the strongest known to the law, and its strength increases with the lapse of time, by the attitude of the friends, relatives and acquaintances of the parties, and by the birth of a child. To overcome it the evidence must be strong, distinct, satisfactory and conclusive (per Lord Lyndhurst in Morris v. Davies, 5 Cl. F. 163; 7 Eng. Reprint 365); so strong and persuasive as to leave no room for reasonable doubt. *Page 585 
"`The law presumes morality and not immorality, marriage and not concubinage, legitimacy and not bastardy.' Teter v. Teter,101 Ind. 129.
"And the Maryland court of appeals in Bowman v. Little,101 Md. 273; 61 Atl. Rep. 1084, defines strict proof in such cases to mean that the invalidity of the marriage must be established `to a moral certainty.'
"The defendant undertook to prove, as a fact, that the statute in effect in Galicia at the time of the marriage and thereafter was such as to render the marriage absolutely void and incapable of ratification, even by cohabitation and the birth of issue. This he has clearly failed to prove. Not only was the civil code, or statutory law, considered in Galicia as the law of the land, but decisions of the supreme court of Austria interpreting the provisions of the code were likewise regarded as law in much the same manner as our own judicial decisions interpreting statutory provisions.
"Because of the customs of the Jewish people generally and because of their deeply ingrained traditions, there were special provisions in the Austrian code with respect to Jewish morals. Sections 126 to 129 relate solely to the requirements of a formal, legal, Jewish marriage. Nowhere in these sections nor in any other part of the code will be found any provision implying that a Jewish marriage performed without compliance with the code provisions is void, as distinguished from voidable. The strongest translation that can properly be given to section 129 is that a marriage performed without compliance with the legal provisions is irregular or invalid. The word `void' or its equivalent is nowhere used. An examination of the reports in the Austrian supreme court reveals that these formal provisions of marriage are dealt with in a manner very similar to the manner in which the courts of our country generally deal with them. For instance, in section 128 it is provided that the party performing such a marriage must enter a record of it in the marriage book in the common language of the country. This section was before the Austrian supreme court in a case which is *Page 586 
reported and cited as G. 12093, and the court held that failure to comply with section 128 did not affect the marriage status, but merely subjected the rabbi or other officiating officer to the penalty provided for in section 131.
"The general rule of our own courts is that the word `invalid' or even the word `void' will ordinarily be interpreted to mean `irregular' or `voidable,' where the failure to comply with formal legal requirements does not involve moral turpitude or contravene the criminal law.
"In the case of Doney v. Laughlin, 50 Ind. App. 38;94 N.E. Rep. 1027, we find the following language (at p. 1028):
"`It has been held that the words void and invalid, when used in regard to contracts not immoral or against public policy, usually mean voidable at the option of one of the parties or someone legally interested therein, and that such construction leads to fewer errors than that which ascribes to those words the meaning of absolute nullity for any and all purposes.'
"In the editor's note in 22 L.R.A. (N.S.) 1205, it is stated that the courts of this country have gone so far as to hold that the marriage of a person under the age of consent is voidable only, even where statutory provisions have declared such a marriage specifically void. As authority for this proposition, the following cases are cited: State v. Parker, 106 N.C. 711;11 S.E. Rep. 517; Smith v. Smith, 84 Ga. 440; 8 L.R.A. 362;11 S.E. Rep. 496. To the same effect is Hunt v. Hunt,23 Okla. 49; 100 Pac. Rep. 541; 22 L.R.A. (N.S.) 1202.
"The general policy of the law of this country is expounded in the case of Fisher v. Fisher, 250 N.Y. 313;165 N.E. Rep. 460.
"The meaning of section 129 of the Austrian code is to be determined by an examination of that section with the context in the light of the decisions of the Austrian supreme court; and such an examination will reveal that the word employed in that section is used in a sense almost equivalent *Page 587 
to the English `voidable;' in the restricted sense, however, that the avoidance is not a matter of right in either party or in both parties or in the state itself, but lies entirely within the court's discretion.
"The Austrian code provided a method whereby such invalid marriages might be set aside, but the decisions held that until such proceedings were taken and brought to a termination the marital status obtained with all of its consequent rights, duties and obligations. The parties could not under any conditions, even by mutual consent, dissolve the marriage by their own act. Paragraph 93. Decision G. 9909 made it clear that this rule applied to Jewish ritualistic marriages, and that to dissolve such a union, even though the ceremonial requirements had not been observed, a legal proceeding must be brought. That no question of public policy was deemed to be involved seems clear from the fact that Jewish ritualistic marriages in which the ceremonial requirements had not been observed were not included among those irregular marriages which might be annulled at the instance of the state. Paragraph 94. Decision G. VIII 3107 goes so far as to hold that the courts of Austria were not obliged to entertain annulment proceedings by one of the parties in interest, but might and sometimes did in their discretion refuse to act at all, or refuse to set aside the invalid marriage.
"In none of these decisions of the Austrian supreme court do the reasons appear which led the court to its conclusions. Although the `common law' marriage as we understand it was not recognized in Galicia, it may well be that cohabitation and the birth of issue might have influenced the court in refusing to annul marriages which otherwise would have been set aside. It is not clear what legal effect would have been given to this marriage by the lex loci contractus, and our courts should therefore decree such legal effect to have resulted as our own notions of equity and justice require. Bodine v. Berg,82 N.J. Law 662; State v. Cromwell, 6 N.J. Mis. R. 221;140 Atl. Rep. 429; Waln v. Waln, 53 N.J. Law 429; Thayer Mercantile Co.,Inc., v. First National Bank of Milltown, 98 N.J. Law 29, 32. *Page 588 
"In New Jersey no formal ceremony is essential to a valid marriage, and an agreement between the parties per verba depraesenti to be hubsand and wife constitutes a valid marriage; so that statutory provisions as to the formal solemnizing of marriages and the preliminaries hereto, and subjecting the official performing the ceremony to criminal punishment for omission of specified ceremonial requirements, are held to be directory merely, and not to affect the validity of marriages so performed. Pearson v. Howey, 11 N.J. Law 12; Atlantic CityRailroad Co. v. Goodin, 62 N.J. Law 394; State v. Thompson,76 N.J. Law 197; Applegate v. Applegate, 45 N.J. Eq. 116;Stevens v. Stevens, 56 N.J. Eq. 488; Mullaney v. Mullaney,65 N.J. Eq. 384; Bey v. Bey, 83 N.J. Eq. 239; Schaffer v.Krestovnikow, supra.
"Had the marriage in question been solemnized in New Jersey, therefore, it would have been valid and binding on the parties thereto even though the banns were not duly published or the record duly kept. Even if the contract had not been per verba depraesenti, the marriage would have been validated by subsequent cohabitation and birth of issue, by the subsequent acts of the defendant in recognition of the status and by his laches in attempting to repudiate the marriage.
"The burden of proving the marriage void has not been met by the defendant. He has not proved that under the law of Galicia the marriage was void or even voidable. This court will therefore hold and does hold that the marriage was valid and binding upon the parties thereto.
"Moreover, the marriage was further ratified and confirmed by the defendant after he became domiciled in New Jersey, and such ratification and confirmation are sufficient evidence in themselves of a valid contract of marriage and estop the defendant to claim that the marriage is not binding upon him. When he left the complainant in Galicia and immigrated to this country in the year 1907 it was upon the understanding that he would send for her and their child to join him in the United States, that they would adopt this country *Page 589 
as their permanent home, as soon as he should be able to establish himself here. There was no delictum, and hence no severance of the domicile of the husband from that of the wife: her domicile was his. The matrimonial domicile has been in New Jersey since the year 1908, and the law of New Jersey governs the determination of the marriage status as it may have been affected by the acts of the parties from that date to the present time.9 R.C.L. 543.
"After coming to this country and after becoming domiciled in New Jersey, the defendant wrote affectionate letters to the complainant. He sent her money from time to time for the support of herself and their child. He planned a home for them here. He applied for citizenship, and in his application made affidavit that complainant was his wife. Finally in 1913 he sent for her and their child to join him here, and furnished her with passage money for that purpose, and she accordingly came with the child with the purpose and in the justified expectation of living with him as his wife in New Jersey, already their matrimonial domicile.
"Assuming that the marriage was void under the law in effect in Galicia, did these acts of the parties after they became domiciled here constitute an assumption of the marriage status?
"That there was mutual consent at the time of and at all times following the ceremony, until the year 1913, is undoubted. Marriage is a civil contract, the essential element of which is mutual consent. The statutory method of contracting marriage is not exclusive. The parties to this suit continued to maintain consenting minds with respect to their married status, the defendant until 1913 and the complainant at all times up to the present. The evidence of this fact is undisputed. Cohabitation is not essential to confirm the status, nor is the birth of issue, nor even proof of habit and repute. Such facts are but evidence of whether a contract exists. Co. Litt. 33a; Wigmore's Case, 2Salk. 438; Pearson v. Howey, supra; Voorhees v. Voorhees,46 N.J. Eq. 411; affirmed, sub nom. Collins v. Voorhees, 47 N.J. Eq. 315,555. *Page 590 
"Hence, by the undisputed evidence, a contract of marriage existed when the matrimonial domicile was transferred to New Jersey. If the marriage was void in Galicia, it became valid as a continuing contract upon the transfer of the domicile to this state, the fact of continuing consent having been proved.Chamberlain v. Chamberlain, 68 N.J. Eq. 736.
"The situation was the same as though the parties had entered into a relationship which would have constituted a common law marriage except for the existence of a statute prohibiting common law marriage, and while maintaining such relationship the statute had been repealed. In such a situation they would have automatically become husband and wife upon the removal of the statutory impediment. State v. Cromwell, supra; In reCrandall, 214 App. Div. 363; 212 N.Y. Supp. 210; Ziegler v. P.Cassidy's Sons, 220 N.Y. 98; In re Hinman, 147 App. Div. 452;131 N Y Supp. 861; affirmed, 206 N.Y. 653.
"The change of matrimonial domicile to a jurisdiction in which common law marriages are deemed valid removed the impediment which previously existed.
"The doctrine of Voorhees v. Voorhees, supra; affirmed, subnom. Collins v. Voorhees, 47 N.J. Eq. 315; rehearing denied,Ibid. 555, to the effect that where there has been an actual marriage, and it is shown to be illegal, evidence of the subsequent cohabitation of the parties and of habit and repute must be related back to the actual marriage and will not justify a presumption of a subsequent marriage, is confined to cases in which the impediment amounted to the lack of capacity of one of the parties. Chamberlain v. Chamberlain, supra; Robinson v.Robinson, 84 N.J. Eq. 201; Dolan v. Wagner, 96 N.J. Eq. 298.
"One of the expert witnesses produced by the complainant was cross-examined at great length by the defendant's counsel, and failed to attend at an adjournment of the final hearing at which his cross-examination was to be continued. A perusal of his testimony satisfies me that further cross-examination would not have served any useful purpose, but *Page 591 
would have constituted unreasonable repetition and prolixity. I have therefore taken into consideration the evidence given by him in spite of the fact that his cross-examination was not completed. To keep the proofs within reasonable bounds, control of cross-examination resides in the trial judge. Donovan v.Limouze, 108 N.J. Law 494.
"I will advise a decree in favor of complainant. The amount of allowance for maintenance and counsel fees will be fixed on settlement of the decree."
An order will be made in conformity with the advice contained in the conclusions of Advisory Master Herr, which are hereby adopted as the opinion of the court.
 LUTHER A. CAMPBELL, Chancellor. *Page 592