CLARKSON A. COLLINS, guardian *ad litem* of GARDNER T. VOORHEES and MARGARET L. VOORHEES, appellants,

*v.*

CHARLES E. VOORHEES, respondent.

On appeal from a decree advised by Vice-Chancellor Van Fleet, whose opinion is reported in *1 Dick. Ch. Rep. 411*.

GARRISON, J. (dissenting).

The attitude of dissenting from the otherwise unanimous opinion of the court, upon so grave a subject as the law of marriage, is so distasteful that I have expended far more effort in endeavors to concur than I have in the formulation of these views, which, after all, I find myself constrained to hold.

The question to be determined upon this appeal is the legitimacy of the children of Abraham and Caroline Voorhees, and that, in turn, depends upon whether the relation of marriage existed between their parents.

The claim of these appellants is, that their father and mother were publicly married, and that they afterwards lived together as husband and wife, and were universally and always so reputed. The respondent, on the contrary, asserts that the ceremonial marriage was void, and that, therefore, no presumption of mar-

riage can be drawn from the subsequent matrimonial conduct and reputation of the parties thereto. The court of chancery adopted this latter view, and declared against the legitimacy of the appellants.

The facts are not in dispute. Abraham Voorhees was married to a wife in New Jersey, and had by her one child, a son. After a time Voorhees separated from his wife, taking up his residence in the city of New York, while she remained in this state. Shortly after this separation, Voorhees brought a suit against his wife for divorce in the superior court of Connecticut. Notice of the pendency of this suit was mailed to the defendant, addressed to the husband's residence in New York, and, consequently, she did not receive it. A month later a decree of divorce was pronounced. Within a short time Voorhees proposed marriage to a lady who resided in West Newton, Massachusetts, to whom, as evidence of his capacity to contract a lawful marriage, he produced a certified copy of the record of the decree rendered in the courts of Connecticut. A marriage was thereupon consented to, and was solemnized by a public church wedding in the presence of a large congregation of the friends and acquaintances of the parties. Two months later the divorced wife learned, for the first time, of the Connecticut suit, and thereupon made an application to that court which resulted in the opening of the decree of divorce, the filing of a cross-bill against her husband, the annulling of the first decree and the granting of an absolute divorce to the wife upon her cross-suit. Of these proceedings Caroline, who was residing with Voorhees in West Newton, was kept in entire ignorance, and down to the time of his death, which occurred some years later, was openly and unequivocally acknowledged and reputed to be his wife. Two children were the result of this union, both born after the second decree of divorce. Abraham Voorhees died in 1882. The father of Abraham was John F. Voorhees. He, by his last will, had given his residuary estate equally to all his children, the children of a deceased child to take the parent's share. The present contest has arisen upon the filing of a bill in the court of chancery of New Jersey by the son of Abraham by his first marriage, the prayer of which is, that

Collins *v.* Voorhees.

that portion of the grandfather's estate which would have come to the said Abraham Voorhees, if living, be paid over to the complainant as the only lawful child of the said Abraham.

From this statement it is evident that the sole question is whether, upon the facts stated, the law raises, in favor of the legitimacy of the appellants, a presumption of marriage between Caroline and Abraham from and after the time when he became capable of lawfully contracting marriage. The court of chancery answered this question in the negative. That decision this court now affirms, for the reasons given by the court below.

The principle of law propounded by the learned judge who heard the case is, that " where an actual marriage is shown, whether legal or illegal, the subsequent cohabitation of the parties and their reputation as husband and wife must necessarily be understood as having had their origin in such marriage, and cannot be treated as presumptive evidence of a second marriage at a later date."

The clearness of the language here employed, and the line of reasoning pursued, permits no doubt as to the precise meaning and force ascribed to presumptions of marriage. The reasoning is this : Marriage may be entered into by mutual consent—that consent will be presumed from conduct and repute in cases where actual consent has not been shown—where an actual contract is shown the parties cannot in fact be supposed to have consented a second time, hence their conduct gives rise to no presumption of marriage. In fine, there can be no presumption of marriage where consent is not a logical inference from the facts proved ; and where matrimonial cohabitation commenced by consent it is illogical to refer its continuance to a subsequent consent.

The fallacy of this argument is, that it assumes that the rule by which the law, from matrimonial conduct, presumes matrimonial consent, is a canon of evidence having for its object the ascertainment of whether in point of fact consent was interchanged, and, if so, at what period of time ; whereas, it is easily demonstrable that the doctrine in question is founded on public policy and is uniformly applied upon principles other than those

which regulate the laws of proof or prescribe the form of the syllogism.

The narrower rule promulgated by the court appears to me to be subversive of this important principle of public law, and to be out of harmony with the entire weight of authority upon this subject.

A somewhat similar view of the law was, it is true, at one time supposed to receive support from the cases of *Cunningham* v. *Cunningham*, decided in Lord Eldon's time, and *Lapsley* v. *Grierson*, which was before Lord Cottenham in 1848. The proposition which these cases were thought to hold was, that if parties, either because of legal impediments or from mere wantonness, entered upon a course of illicit cohabitation, their subsequent matrimonial conduct, with its resulting reputation, would, as matter of law, be so colored by its original meretriciousness that no matrimonial consent could be presumed. In 1867 the case of *Campbell* v. *Campbell* was before the house of lords upon this precise point, and it was the opinion of every judge that the doctrine above stated received no support whatsoever from either of the cases cited or from any case, while the doctrine itself was distinctly and emphatically repudiated. This case (*Campbell* v. *Campbell*), oftener spoken of as "*The Breadalbane Case*," has, since its decision, been universally accepted as the leading authority upon the doctrine of presumption of marriage. The facts of the case were these: James Campbell had eloped with the young wife of a middle-aged grocer named Ludlow. They fled to Canada, where they lived in connubial constancy and repute until after the death of Ludlow, of which, however, there was no proof that either of them ever heard. They returned to England, and, after the birth of a son, settled in Scotland, where they passed themselves off uniformly, unequivocally and constantly as man and wife. The case came before the courts, and ultimately before the house of lords, upon the claim of the grandson to the estates of Breadalbane in the right of his father. The claimant's father was born in England after the return of his parents from Canada, and after the death of Ludlow, the first husband of his mother. The case turned, therefore, upon the

·question of the legitimacy of the claimant's father, and that depended upon whether his parents were lawfully intermarried. The chief contention pressed, as matter of law, against the presumption of marriage was, that the original coming together of ·the parties having been meretricious, their subsequent conduct must be referred to that illicit relationship, and could not, in law, raise the presumption that the parties had contracted a subsequent marriage.    In his opinion to the house of lords upon this point, Lord Westbury said : " The appellant objects that the cohabita- ·tion, which began when the parties were incapable of contracting marriage, and which was continued without change, is ineffectual to form the basis of the conclusion that consent to marry was interchanged after the impediment to marriage had been removed. That would be a very important rule if it were proved to be well founded ; but I am unable to find any principle to justify the introduction of such a rule, and what is more material to the purpose, I am unable to find any case or any book of authority in which that principle has been either followed out into a decision ·or has been laid down as a rule of Scotch law.    It appears to be .almost entirely derived by the appellant from what I conceive to be a misapprehension of certain words found in the judgments delivered in *Cunningham* v. *Cunningham* and *Lapsley* v. *Grierson*, or rather (if I may venture to say so), from a misapprehension of part of a marginal note to one of those cases.    There is noth- ing (in those cases) to warrant the proposition, that the subsequent ·conduct of the parties shall be rendered ineffectual to prove mar- riage by reason of the existence at a previous period of some bar ·to the interchange of consent.    It would be very unfortunate if it were so.    There is no foundation for the argument, that the matrimonial consent must, of necessity, be referred to the com- ·mencement of the cohabitation, nor any warrant for the appel- lant's ingenious argument, that as the consent interchanged must be referred to some particular point—which he insisted was at the commencement of the cohabitation, and therefore insufficient— the cohabitation which continued afterwards without interruption would warrant no other conclusion than that which would be ·warranted by the consent interchanged at a time when it was

insufficient.   I should undoubtedly oppose to that another and,... I think, a sounder rule and principle of law, namely, that you.. must infer consent to have been given at the first moment when.. you find the parties able to enter into the contract."

To the same effect were the opinions delivered by Lord Chelms-- ford, lord chancellor, and Lord Cranworth.

The *Breadalbane Case* was decided in 1867.   *L. R. (1 H. L. Cas.) 182.*   At a later period, in 1876, the house of lords was-- called upon, in the case of *DeThoren* v. *The Attorney-General,.* to deal with a set of facts in all respects the exact counterpart of the case which is now before this court.   The case is reported in. *1 App. Cas. (L. R.) 686.*

The point before the court in that case is thus stated. by Lord. Chelmsford : " The question," he says, " to. be determined is; whether there was a consent to a marriage between William Ellis- Wall and Sarah Ogg, evinced by habit and repute, prior to the-- birth of the elder of their sons.   If there were no other question. than this in the case, there would be no difficulty in giving an. answer in the affirmative.   But the appellant, although he admits. that there had been such cohabitation of the parties as husband and wife as in ordinary cases would have conclusively established. the presumption of a marriage by consent, yet contends that the-- circumstance of a previous ceremony of marriage having taken place between the parties which was invalid,.though unknown to. them to be so, prevented that presumption.   The ground of this. argument is, that the living together of the parties as husband and wife must be attributed to the invalid ceremony, and there-- fore that the habit and repute could not be evidence of any other. consent."

The invalidity of the ceremonial marriage alluded to was, that: the husband was not, at the time of his second marriage, lawfully. divorced from his first wife, and although. he became a divorced. man shortly afterwards, neither he nor his second wife appear to-- have known of the removal of the impediment.   It is evident that every question raised by the case in hand was presented also. upon the facts of that case.   By the unanimous judgment of the. house of lords it was decided :

1. That the subsequent cohabitation and reputation were not to be referred to the inefficient ceremony, even though the parties did not know of the removal of the impediment to their original marriage.

2. Where parties are cohabiting matrimonially but unlawfully, because of an impediment to their marriage, matrimonial consent must be presumed to have been interchanged as soon as the parties were enabled, by the removal of the impediment, to enter into the contract.

3. The ceremony, although invalid, was a consent by the parties to a cohabitation which was matrimonial in character, and their subsequent cohabitation was proof of a continuing consent thereto.

To the principles thus announced I give an unqualified assent. It is especially material to the matter in hand to note that in every opinion delivered the doctrine of presumption of consent is treated as a principle having its root in public policy. At no time was it regarded as a rule of evidence for determining whether the parties had interchanged consent. Such a consideration is evidently out of place, for the reason that the whole fabric of the doctrine rests upon the necessity of presuming something which is not proven, and that something is *consent*, and *consent* at a time favorable to the end which the rule of public policy has in view. That end is the uniform reference of matrimonial conduct to the *status* of marriage, for it is with the *status* of marriage that society is chiefly concerned. The contract is made by the parties without consulting society; the *status* is imposed by society without consulting the parties. The contract may be actual and ceremonial, or actual and non-ceremonial, or it may be neither actual nor ceremonial, but simply presumed from the policy of the law. That policy is, as I have said, that all matrimonial conduct shall, if possible, be referred to a matrimonial *status*. Where the marriage is actual the *status* at once arises, in order that connubial conduct and repute may be under its sanction; and where the conduct and repute are matrimonial, consent is presumed in order that the *status* may at once arise. If, at the time of the commencement of matrimonial conduct and reputa-

tion, there is impediment to the application of this doctrine, the rule of public policy is not thereby defeated ; it remains in abeyance, to be imposed at the first moment when conduct and capacity shall so co-exist as to render it possible. If an actual marriage has been solemnized, that circumstance, so far from frustrating the policy of the law, affords the strongest possible case for its application ; for where the character of the consent is not in question, but simply its legality, the *status* of marriage should arise at the earliest moment when the parties are enabled lawfully to do that which they had theretofore ineffectually attempted.

From the broad principle thus laid down we turn to the decision of the case in hand, the doctrine of which is, that consent cannot be presumed from matrimonial conduct and reputation in any case in which the parties have actually celebrated a marriage to which, in their own minds, they referred their conduct. In support of this proposition two cases are cited in the opinion adopted by this court—*O' Gara* v. *Eisenlohr, 38 N. Y. 296,* and *Cartwright* v. *McGown, 121 Ill. 388.* No such doctrine is laid down by these cases, nor do the facts of either case call for or admit of such a conclusion.

*O' Gara* v. *Eisenlohr* was a case in which the original union of the parties was illicit, because the man had a wife living the date of whose death was unknown. The court was asked to raise the presumption that her death had occurred between certain years. The case turned entirely upon the law relative to presumptions of death, and does not touch the doctrine concerning the presumptions of marriage. If it is possible to regard this case as an authority upon the proposition now before us, its weight is entirely against the position of the court below, in that it mentions with approval the cases of *Fenton* v. *Reed, 4 Johns. 52,* and *Rose* v. *Clark, 8 Paige 574,* in both of which the doctrine which I am now seeking to enforce is declared in the clearest manner.

In *Fenton* v. *Reed* the facts were, that after the prolonged absence of her husband the plaintiff married Reed. Subsequently the first husband came back, the plaintiff and Reed continuing, however, to live together as man and wife until and after the death of plaintiff's first husband. The court·held that,

Collins *v.* Voorhees.

upon this state of facts, it was a question for the jury whether the circumstance of this cohabitation evinced a marriage, other than the actual one, occurring after the death of the first husband.

In *Rose* v. *Clark* the facts were substantially those of *Fenton* v. *Reed.* Chancellor Walworth, in reviewing the cases, says : "It appears from the decisions in our own courts, as well as in England, that a subsequent marriage may be inferred from acts of recognition, continued matrimonial cohabitation and general reputation, even where the parties originally came together under a void contract of marriage."

It may, I think, be safely asserted that no case can be found in the New York reports from 1809, when *Fenton* v. *Reed* was decided, down to *Gall* v. *Gall,* decided in 1889, in which any different doctrine has been held or even intimated.

The other case relied upon is *Cartwright* v. *McGown,* in which the facts did not raise the question presented by the case before us, but in which, strangely enough, the judge who delivered the opinion of the court imagined, as an illustration, just such a state of facts as that with which we have to deal, and said : "That in such a case the presumption of marriage would apply even though the parties may not have known of the removal of the impediment to their original marriage."

The doctrine of the present case derives, therefore, no support from the only cases cited as sustaining it. If any authority for such a doctrine exists elsewhere I have failed to discover it. It stands, as it appears to me, as an innovation upon established law upon a most important branch of jurisprudence, and is radically destructive of the principle of public policy to which I have alluded, the uniform application of which is illustrated, amongst others, by the distinguished authorities to which I have referred.

For these reasons I cannot vote to affirm the judgment rendered in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, DEPUE, MAGIE, REED, VAN SYCKEL, BROWN, CLEMENT, COLE, SMITH, WHITAKER— 10.

*For reversal*—GARRISON—1.