## FRANZEN v. E. I. DU PONT DE NEMOURS & CO., Inc.

### No. C–1070.

District Court, D. New Jersey.
July 22, 1943.

See, also, 36 F.Supp. 375.

Abraham J. Slurzberg, of Jersey City, N. J., for plaintiff.

Katzenbach, Gildea & Rudner, of Trenton, N. J. (Louis Rudner, of Trenton, N. J.), for defendant.

FORMAN, District Judge.

A complaint was filed on behalf of the above-named plaintiff on August 2, 1940, in which it was alleged that she is the widow of George Albert Franzen, deceased. She was living with him as his sole dependent at the time of his death on August 6, 1939.

He was pursuing his trade as a pipe-fitter in the employ of the defendant in the construction of an operating plant at Baton Rouge, Louisiana, and was in the act of disconnecting a pipe when his body made contact with a lighting circuit which instantly electrocuted him.

There are further allegations in the complaint, among which are the diversity of citizenship of the parties and that the action arose under the Employers' Liability Act of the State of Louisiana, Act No. 20 of 1914, as amended, by virtue of which it was claimed for the plaintiff that she was entitled to receive from the defendant workman's compensation for a period of three hundred weeks from August 7, 1939, at the rate of $14.30 per week.

The differences between the parties hereto have followed a tortuous path of litigation. Prior to the filing of her complaint in this court, she instituted a proceeding under the New Jersey Workmen's Compensation Laws, N.J.S.A. 34:15-1 et seq., in 1939 and hearings were conducted in the New Jersey Workmen's Compensation Bureau which resulted in a determination and judgment entered in her favor on January 2, 1942, wherein the Commissioner held (1) that the contract of employment was effected in the State of New Jersey and that the Laws of the State of New Jersey control, and (2) that petitioner was the common law wife of the decedent by virtue of a marriage contract entered into between the parties in the State of New Jersey on April 17, 1937 and that she was the dependent of decedent and entitled to workman's compensation benefits under the laws of New Jersey.

These proceedings were reviewed by a writ of certiorari granted by the New Jersey Supreme Court on February 2, 1942, as a result of which, on August 6, 1942, judgment was reversed. In so deciding, the court held that the contract of employment was not a New Jersey contract but subject to the laws of Louisiana. Having decided this aspect of the case, the court found it unnecessary to consider the respondent's status as common law wife of the decedent.

After the ruling by the Commissioner in the New Jersey Workman's compensation proceedings, plaintiff moved for a summary judgment in this case but that was denied on August 21, 1942, following the reversal of the judgment of the latter by the New Jersey Supreme Court.

The trial of the case without a jury followed. Arguments have been submitted and the case is before me for decision.

Since it appears that the plaintiff has lost her suit for workman's compensation under the New Jersey law, she is relegated to her remedy under the Session Acts of the State of Louisiana of 1914, Act No. 20, as amended to and including July 31, 1940.

At a pre-trial conference on December 10, 1941, it was agreed among other things that the decedent, Franzen, was engaged in employment in Louisiana that brought him within the purview of the said laws of State of Louisiana. It was also agreed that the rate of wages paid to decedent was $44 per week at the time of his death.

Common law marriages cannot be contracted under the laws of Louisiana. The law of that state recognizes only such marriages as are contracted and solemnized according to the rules which it prescribes. See Civil Code of Louisiana, Articles 86, 87, 88, 90, 117 and 118.

The plaintiff concedes that she did not comply with the requirements of law of

Louisiana with respect to her alleged marriage to the decedent. She contends that she contracted a valid common law marriage with the decedent in New Jersey and if this is so she will be recognized as an appropriate beneficiary under the Workmen's Compensation Law of Louisiana.

The question in this case, therefore, is whether the plaintiff contracted a valid common law marriage to the decedent in New Jersey.

Prior to 1919 plaintiff went to live in the small town of Fairview, near Camden, New Jersey. She had been married to a man named George Fisher in 1916, but this marriage was unsuccessful and by about the year 1919 she was separated from her husband and ultimately this marriage was dissolved by divorce in the year 1935.

Some time after the year 1919 she took up housekeeping for a man named Irving Wendell and lived in his house until he died in the year 1933. Alexander L. Gordon also lived in the house with Wendell and plaintiff. At one time he lived with the parents of George Franzen, the decedent. After Wendell's death plaintiff moved to another house at 2866 Constitution Road, in the same town, and Mr. Gordon boarded with her at this address.

The defendant succeeded in showing beyond any doubt that the plaintiff was for years known as Mrs. Reba Wendell in the community of Fairview. She was extremely reticent about admitting this at the trial, but the proof that she responded to that name over a long period of years and after the death of Mr. Wendell in 1933 was overwhelming.

About 1934 the decedent, George Franzen, began paying attention to the plaintiff. He courted her at 2866 Constitution Road in Fairview for about three years, until April, 1937. He was then employed by the defendant at Deepwater in New Jersey. According to the plaintiff, they had planned marriage during the year 1937 but no definite date had been fixed for their wedding.

On Saturday, April 17, 1937, according to the plaintiff, George Franzen called upon her and informed her that his employment in New Jersey was about to cease but that he was offered work at his trade in a plant of the defendant under construction at Baton Rouge, Louisiana. The afternoon or early evening of that day plaintiff and decedent went shopping for some necessary articles of clothing for his trip to Louisiana. He stayed the evening with plaintiff and finally announced that he wanted plaintiff to marry him or he would be disinclined to make the trip to Louisiana and work there. If she married him he promised to send for her to join him as soon as he was settled there. Plaintiff objected that a marriage could not be performed at that hour. She stated that thereupon decedent said, "We'll make our own vows." She acquiesced in the arrangement, he repeated words to the effect that he was taking her for his wife, and she, that she accepted him as her husband. He produced a ring from his pocket and put it upon her finger. He stayed with her that night.

Mr. Gordon had been with the couple for part of the time on Saturday. In fact he had driven them to the stores where they had done the shopping. In the evening he retired early and left them talking. After rising on the following morning he found plaintiff and decedent preparing breakfast and decedent accosted him with an invitation to "Meet the wife", referring to plaintiff. Later that day all three went to a restaurant at Camden for a dinner in the nature of a wedding celebration. After dinner the decedent discussed the prospect of plaintiff soon joining him at Baton Rouge and Mr. Gordon's continued use of the house was arranged. Plaintiff did not own the house and for some reason it seems to have been rented in the name of Mr. Gordon. Decedent agreed to pay part of the rental and running expenses and Mr. Gordon was to keep the house in order pending decedent's and plaintiff's return.

Decedent spent Sunday night with plaintiff at the Constitution Road house. Up to this time he had lived with his parents in the same town but at some distance from the house of the plaintiff.

Early Monday morning decedent left plaintiff to get his belongings for use in Louisiana and returned to the Constitution Road house to pick up the accessories purchased by plaintiff and decedent and to bid plaintiff goodbye. Plaintiff said that decedent told her that he would arrange to send her money so that she could go to Baton Rouge and live with him down there. On his return to the house of plaintiff that morning he was accompanied by a fellow worker named Clancy with whom he was to drive to Baton Rouge. Clancy had picked him up at his mother's house.

Clancy remained outside of the Constitution Road house while decedent entered plaintiff's house, secured his additional belongings and bade plaintiff goodbye.

Now ensued a lapse of time until June 15, 1937, when having been supplied with funds by the decedent, plaintiff left to join him in Baton Rouge, Louisiana. Aside from Mr. Gordon she did not produce anyone to whom she announced the fact that she had contracted marriage with the decedent on April 17, 1937. In fact, Mrs. Ethel Simon, a friend, who claimed to be intimate with her, said that she had seen her nearly every day and accompanied her to the railroad station when she left for Louisiana. Later she wrote to Mrs. Simon and said that she and the decedent had been married in Louisiana and asked her to please insert an announcement of that fact in the local village newspaper. Other friends testified that she told them she was going to be or had been married in Louisiana.

Plaintiff did not go to the parents of the decedent or to any members of his family and announce that she had contracted a marriage with the decedent on April 17, 1937.

She stated that she received a number of letters from decedent during the period transpiring between April 19, 1937, and when she left for Louisiana and these were addressed to her by decedent as his wife, but these letters were carried with her to Louisiana. She lost her baggage on this trip and these letters were contained in her travelling bag.

She arrived in Baton Rouge on June 15, 1937. Decedent met her and they stayed at the Louisiana Hotel in Baton Rouge where they registered as Mr. and Mrs. George Franzen. She was, of course, perturbed and inconvenienced by the loss of her baggage and she forthwith made claim against the railroad company for the loss thereof. This claim against the railroad company was prosecuted in the name of Reba Jacoby, which was her maiden name before she married Fisher. Eventually a remittance was forthcoming from the railroad company to her which she accepted and endorsed in the name of Reba Jacoby. This remittance was in the form of a check dated August 5, 1937, and was also endorsed by the decedent under plaintiff's signature as Reba Jacoby.

After their first night's stay at the Hotel, decedent took plaintiff to the boarding house where he lived with fellow employees and their wives and introduced her as his wife and she was known to all from then on as Mrs. Franzen. Later a bank account was opened in their joint names in Louisiana. There are a number of checks in evidence made by the decedent to the plaintiff as Reba Franzen soon after her arrival in Baton Rouge in June of 1937. These were made out to her order by decedent in his handwriting as Reba Franzen and so endorsed by her.

In September of 1937 decedent was granted a vacation. Plaintiff and decedent returned to Fairview for a period of about two weeks. The trip north was made by plaintiff and decedent in an automobile in which they were accompanied by a Mr. and Mrs. Wallace who lived in New Jersey also. Throughout this period and to whomever decedent introduced plaintiff she was known as his wife. However, during this period plaintiff did not call upon decedent's parents. Plaintiff says that they lived together at the house on Constitution Road but decedent's mother says that decedent spent his nights at her home.

Plaintiff did not return to Baton Rouge with the decedent, but again remained at the house in Fairview under an arrangement to rejoin him in the south later on. During the period of this separation, which was but a few weeks, plaintiff received from decedent a number of letters, offered in evidence. Each one was addressed to her as "Dearest Wife" and signed "Your loving husband" and enclosed in an envelope addressed to plaintiff as Mrs. George Franzen. These letters indicate a normal regretfulness that plaintiff did not return to Baton Rouge with him and an appropriate fond anticipation of her arrival in Baton Rouge.

Plaintiff returned to Baton Rouge and took up the threads of her life there until the following spring, when decedent was granted another vacation and she returned to Fairview with decedent. This time they did visit the house of his parents and since the house on Constitution Road had been surrendered they stayed for at least one of the nights of their vacation at the home of decedent's parents. On this trip they also called upon plaintiff's mother who lived in Pennsylvania. Decedent announced to her that they were man and wife, saying to

plaintiff's mother words to the effect, "I can call you mother now because Reba and I are married". After this vacation of ten days to two weeks in the north, they once more returned to Baton Rouge where they lived together until the unfortunate accident on August 6, 1939, which resulted in decedent's death.

His body was returned to a funeral establishment in his home town from which the funeral was held and plaintiff stayed at the home of decedent's parents during this time and for some days thereafter, being treated as if she were the widow of the decedent.

The testimony of Alexander L. Gordon was not given by him in this case. He gave a deposition in the Workmen's Compensation proceedings from a sick bed at the Lakeland General Hospital, Blackwood, New Jersey, on December 21, 1939, in the presence of counsel for both parties. He never recovered from that illness and the deposition is offered in evidence in this case.

The defendant objects to the reception of the deposition on the ground that it is inadmissible in the New Jersey courts under the evidence laws of this state because the testimony of a party or witness who has been examined in open court and has since died is receivable in evidence only "upon a new trial of a civil action wherein the parties have been examined as witnesses." R.S. 2:97–14 and 2:97–15, N.J.S.A. The depositions of a *party* who has died after the taking of the depositions are admissible only upon the trial of the cause or upon a new trial of the cause. R.S. 2:100–40 to 45, N.J.S.A.

However, in this Circuit in the case of Smythe v. Inhabitants of New Providence Township, 263 F. 481, 487, which was an appeal from the decision of this court, Judge Woolley expressed the opinion for the court in favor of the admission of testimony such as is offered here in the following language: "From the cases collated in Toledo Traction Co. v. Cameron, supra, as well as from all authorities which have been shown us and which we have found by our own research, it appears that testimony, given in a former civil action or at a former trial of the same action by a witness who has since died, is admissible in a later action if between substantially the same parties and substantially the same issue is involved, on the theory that such testimony is, both at common law and by long usage in the courts of this country, regarded as one of the exceptions to the general rule against hearsay testimony. The requirement of Section 861 [28 U.S.C.A. § 635] of proof 'by oral testimony and examination of the witnesses in open court' is satisfied by the presence at the later trial of a witness who heard (or stenographically reduced) the testimony of the witness since deceased; and if the witness since deceased gave his testimony at a former trial, under oath, and under cross examination or opportunity of cross examination by the party against whom it was offered at the later trial, the objection to the hearsay rule is overcome, and his testimony, if adequately preserved, is clearly admissible. Toledo Traction Co. v. Cameron, [6 Cir.] 137 F. 48, 69 C.C.A. 28; Mattox v. United States, 156 U.S. 237, 241, 242, 15 S.Ct. 337, 39 L.Ed. 409; 10 R. C.L. 966; 2 Jones on Evidence, §§ 336, 337."

I do not believe the present rules of civil procedure diminish the breadth of this decision or that it is ruled by the decisions of the New Jersey Courts.

The testimony of Mr. Gordon was given in a former civil action between the *same* parties involving the *same* issue and defendant had the opportunity to cross examine and did so. His testimony was taken stenographically, duly transcribed, and adequately preserved. It will be admitted.

Mr. Gordon was very specific as to the announcement of decedent on Sunday morning, April 18, 1937. He said that it consisted in his finding decedent and plaintiff preparing breakfast and that decedent used the words "Meet the wife" as his mode of making the announcement. He further referred to the status of plaintiff and decedent on that day in the following testimony:

"Q. Now, what did you do later that day, that Sunday? A. Well, I drove them up to the restaurant at Broadway and Federal and we had dinner; he said he was celebrating his wedding.

"Q. What restaurant was that, Mr. Gordon, please? A. I just can't recall now; it is right next to the Lintonia.

"Q. That is up in Camden? A. Yes, on Federal Street, right opposite the City Hall.

"Q. After dinner what did you all do, after you had this dinner? A. After dinner we came back home.

"Q. That is, to 2866? A. To 2866 Constitution Road.

"Q. What did you do the rest of the evening? A. I was out part of the time, but when I came back we talked for a little bit and I went on to bed.

"Q. If you remember, what did you talk about—anything Particularly pertaining to George going away? A. Oh, why, we talked about—made a proposition to me; when he sent for Reba he wanted me to stay and take care of the house until they come back.

"Q. You say he made some proposition to you of taking care of the house? A. Yes, he made a proposition; if I would pay part of the rent and pay the gas and lights, why, he would pay the other part.

"Q. He would pay the rent? A. Yes.

"Q. Was there anything discussed right then in your presence about—you said he was going to send for Reba? A. Yes.

"Q. What was said at that time? A. Well, he said as soon as he got established he would send for her to come down to Louisiana."

This testimony was given in December of 1939.

In plaintiff's exhibit 16, among various letters addressed to plaintiff are three from Mr. Gordon dated respectively July 8, August 4 and September 10, 1937. In each of these letters Mr. Gordon addresses plaintiff and decedent in the heading of the letter as "Mr. and Mrs. George Franzen" and salutes them as "Dear Friend". In each of these letters he harks back to the proposal that he should carry on in the house, pay the rent and other current expenses. In these letters, the first of which is written soon after the plaintiff departed for Louisiana, he reports upon the condition of the house, upon expenditures made by him, and discusses the advisability of the purchase of the house by plaintiff and decedent. The letters are not the product of afterthought and cannot be said to have been written with any thought that they would some day be examined in a court room. When taken into consideration with his testimony they give it a stamp of truth-telling.

On behalf of the defendant there was offered among other evidence the testimony of Frank Franzen, brother of the decedent; Karl Franzen, another brother of the decedent; and Elton Murphy, a personnel officer in the defendant's plant at Baton Rouge. All of these witnesses were offered for the purpose of giving testimony concerning statements made by the decedent as to his marriage status.

Plaintiff objected to this testimony on the ground that admissions made by the decedent not in the presence of the plaintiff could not bind her. She cited as authority for her objection the case of Hubatka v. Maierhoffer, 81 N.J.L. 410, 79 A. 346 and other New Jersey cases. The Court of Errors and Appeals of New Jersey held in the last-mentioned case that where the question for determination is whether a marriage exists or not the declaration of one of the parties to the alleged marriage who is since deceased cannot be received in evidence against the other party if not made in his or her presence. This case appears in the footnote in Wigmore on Evidence wherein the following comment is made by that noted authority: "New Jersey: 1911, Hubatka v. Maierhoffer, 81 N.J.L. 410, 79 A. 346 (action by a daughter to obtain title to land of her mother; a deed conveyed to Josephine M. and the defendant M.; the issue was whether Josephine was the wife of M.; Josephine's declarations that she was not were held inadmissible; same fallacy; the declarations of J. ought to be interpreted as declarations about her relationships as including M., hence she is qualified; it is strange how difficult this simple idea seems to many learned judges);" 3 Wigmore on Evidence (2d Ed.) Section 1491, page 231.

In an annotation to the case of Drawdy v. Hesters, 130 Ga. 161, 60 S.E. 451, 15 L.R.A.,N.S., page 190, the admissibility of declarations of one since deceased against his or her own marriage is briefly discussed. It is stated therein that the courts are about equally divided as to such admissibility.

The defendant calls attention to the case of Jewell's Lessee v. Jewell, 42 U.S. 219, 231, 1 How. 219, 11 L.Ed. 108. In that case the court permitted a witness who was related by marriage to one of the litigants to testify that it was known in the family that his wife's mother had not been married to her father. The court said: "It is true that Simons cannot be presumed to have known of his own personal knowledge the particular fact of which he was speaking;

and he must have made the statement upon information derived from others. He does not appear to have named the person from whom he obtained his information, nor to have stated that his knowledge was derived from the general understanding and reputation in his wife's family. But the knowledge of events of this description most generally exists in every family, and hence the declarations of one of. its members is [are?] admissible, although he does not mention the source from which he derived his information; and such declarations are equally admissible whether his connection with the family is by blood or marriage. In the case of Vowles v. Young, 13 Ves. 140, testimony precisely similar to that now offered was received; and we think the declarations of Simons ought to have been admitted, and that the Circuit Court erred in rejecting them."

Under Rule 43(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, all evidence is admissible in federal court proceedings which heretofore has been admissible either under a state rule of law, a federal rule of law, or a statute, and the rule particularly admonishes that the "statute or rule which favors the reception of evidence governs". Recent federal cases have accordingly admitted such testimony allowable in the federal courts but refused admission in the state courts. See McCarthy v. Palmer, D. C., 29 F.Supp. 585; Boerner v. United States, 2 Cir., 117 F.2d 387; Commercial Banking Corp. v. Martel, 2 Cir., 123 F.2d 846; National Battery Company v. Levy, 8 Cir., 126 F.2d 33.

██ Testimony of this nature has been received upon the ground that it was part of the res gestae and as in the Jewell case on the doctrine that it speaks to pedigree out of family relationship and as such should be excepted from the hearsay rule. I .believe that the broadest gate should be opened to this type of testimony, particularly as here where the statements are alleged to have been made by one of the *parties* to the *relationship itself*. Once admitted such statements can be carefully scrutinized for weight and given only such value as they deserve in association with all of the facts and circumstances shown in the given case. The admission of this evidence is not substantive to the extent that the ruling in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, requires me to follow the New Jersey case

of Hubatka v. Maierhoffer, supra. Hence I will regard this testimony as properly in evidence.

The first evidence of this nature was by Frank L. Franzen, who testified that he was one of the brothers of the decedent and had known the plaintiff for at least ten years. He knew her as Reba Wendell and had called at the house at which she lived during Mr. Wendell's lifetime. He knew that Mr. Gordon, whom he referred to as "Pop" Gordon, lived there and he and other visitors played cards and fraternized at the plaintiff's house on Constitution Road and in the one she occupied before that time. He further testified that sometime after his brother, George, left for Louisiana, he saw the plaintiff who told him that she was leaving for Louisiana and was going to marry his brother, George. He next saw plaintiff and his brother when they came back during the vacation period in September of 1937. They called at the house of the witness and the plaintiff told him that she and his brother had been married in a church in Louisiana, and she named some of the people who had "stood up with them". The witness further testified that later in the evening when he was alone with his brother, the decedent, he asked him whether he was married and the decedent simply smiled.

Karl Franzen, another brother of the decedent, was the second witness to whose testimony along this line there was similar objection by plaintiff. He swore that he attended a social club in the village of Fairview with plaintiff and decedent during one of the evenings of the vacation in September of 1937. A number of the club members, their wives and friends, were gathered in a group and there was some discussion among them about whether or not the decedent and plaintiff were married. Later, at the bar when the decedent and the witness were alone he forthrightly asked the decedent whether he and the plaintiff were married. Decedent's only answer was to laugh and smile. That was on a Saturday night and the witness being still perplexed about the marital status of the decedent on the following day while at their mother's house, again sought out the decedent and asked him whether he and the plaintiff were married to which decedent replied, according to the witness, "No, I'm not married. Reba and I are living together".

The third witness in this category, Elton Murphy, testified that the decedent appeared at the plant of the defendant at Baton Rouge on April 22, 1937. In response to an inquiry made by witness, prompted by a question on the company's employment record card as to whether he was married or unmarried, decedent stated that he was not married. The witness further testified that the decedent gave the name and address of his mother as the person to be notified in case an accident befell him. The card was offered in evidence and contained the record corroborating the witness' testimony.

The reactions of decedent to questions concerning his purported marriage to plaintiff as described by the Franzen brothers cannot be afforded too much weight. They are inconsistent with other actions by the decedent as, for instance, his statement to Mr. Gordon, his letters to the plaintiff, his introductions of her to his friends, his writing of checks to her in the name of Franzen and numerous other acts.

Mr. Murphy's testimony refers to the perfunctory questions for the employment records of the defendant. The records were made out very shortly after decedent arrived at his new station in Louisiana. He submitted his mother's name as the person to be notified in case an accident occurred to him. No particular significance need be attached to this as he might just as well have submitted his father's name. He answered in the negative the question as to whether he was married. Just why he answered so cannot be determined and his motive for the answer must remain in the realm of speculation. However, neither the testimony of the Franzen brothers nor of Mr. Murphy concerns itself with incidents of sufficient weight to overthrow stronger and more persuasive proofs of the existence of the relationship claimed by plaintiff.

While it is conceded that the plaintiff and decedent actually underwent no marriage ceremony in Louisiana, their relationship in that state over a period from June of 1937 until decedent's death in 1939 gave all the outward manifestations of a common law marriage that would have been recognized in those states where such marriages are accredited. They lived together as man and wife; they held each other out to their entire circle of associates as man and wife. Their friends and relatives in the north knew them as man and wife and mail was so addressed to them. Their bank account in Louisiana was a joint one and when they sought financial assistance from a lending institution they applied as Mr. and Mrs. George L. Franzen. Every characteristic of a common law marriage was present in Louisiana. As has been pointed out, this will not suffice to give the plaintiff the right to claim compensation for the death of the decedent and the question that we must resolve is whether or not the common law marriage, many of the manifestations of which we find to be present in Louisiana, had its legitimate inception in New Jersey.

The defendant contends that this could not be so and points to the brief time of only a day and two nights in which the parties lived together in New Jersey before decedent left for Louisiana. It emphasizes the fact that in the period between April 19, 1937, when decedent left for Louisiana, and June 15, 1937, when plaintiff joined him in Louisiana, she did not make known to decedent's parents, or his or her family and friends, that a marriage had been contracted between her and the decedent and, on the contrary, indicated that she expected to marry the decedent when she went to him in Louisiana. It shows the conduct of the plaintiff when she arrived in Louisiana in claiming compensation for the loss of her baggage in her maiden name "Jacoby". It points to the testimony of his brothers and Elton Murphy as directly refuting such a marriage status.

It is difficult to apply absolute yardsticks to human behaviorisms in cases of this kind. The plaintiff was no longer a young girl. She had an unsettled family life. Her marriage to George Fisher had been a failure and many years had passed before it was terminated but there is no question but that it was terminated in legal fashion in 1935. Meanwhile, she was understandably reticent about her association with Irving Wendell. There can be little doubt that there was a close association and that she was known for many years as Mrs. Reba Wendell, even to the extent of voting under that name. But whatever this relationship was, it was certainly terminated with Mr. Wendell's death in 1933. Therefore, after 1935, the date of the divorce from Fisher, there was no impediment to her honorable association with decedent and from the evidence there seems to have been a normal courtship until the necessity arose in his employment

which required him to leave for Louisiana. This required a decision as to their future. Of course they could have adopted the customary and usual form of marriage. They met the situation by effecting the unconventional ceremony. It is not difficult to recognize the embarrassment thus created for the plaintiff, her natural desire to avoid decedent's family and her inhibitions in her statements concerning her marriage, originating as it did in informality.

The claim made by plaintiff for her lost luggage and the failure of decedent to indicate that he was married on his employer's records both were lapses at a very early stage of the relationship that are readily accounted for.

The defendant has called to my attention a decision by the Camden District Court on November 10, 1942, in a case of this plaintiff against the Equitable Life Assurance Society of the United States. There the court concluded that there was no marriage and that the plaintiff was not decedent's widow.

However, of equal standing before me is the decision of the Commissioner, on January 2, 1942, in the proceeding between this plaintiff and the defendant, before the New Jersey Department of Labor, Workmen's Compensation Bureau, in which he concluded "that a common law marriage existed between Reba Franzen and decedent, George Franzen, on April 17, 1937, that the marriage was made in New Jersey on that date, * * *". In dealing with this proceeding, the New Jersey Supreme Court reversed the Commissioner on other grounds and found it unnecessary to consider this conclusion.

We, therefore, have two decisions by other trial courts, each opposed to the other on this question, and the choice is left entirely open.

 A common law marriage in New Jersey is defined in the case of Jackson v. Jackson, 94 N.J.Eq. 233, 113 A. 495, 496, 118 A. 926, in the following language: "Marriage is a civil contract, and no ceremonial is indispensably requisite to its creation. Voorhees v. Voorhees' Ex'rs, 46 N.J.Eq. 411, 414, 19 A. 172, 19 Am.St.Rep. 404, affirmed, [Collins v. Voorhees], 47 N.J. Eq. 315, 20 A. 676, 14 L.R.A. 364, 24 Am.St. Rep. 412. Where there is no ceremonial marriage, there must be an agreement entered into between the man and the woman, in words of the present tense, to live together as husband and wife. There are probably but few instances of mutual consent, by which each party in precise or unambiguous terms takes the other as spouse, but no particular words are necessary to declare an intention to enter into a contract of marriage. If from what was said by the parties, aided by the circumstances surrounding their entering upon their relationship, it can be gathered that they proposed to enter into a contract thenceforth to live as husband and wife, it will be sufficient (Stevens v. Stevens, 56 N.J.Eq. 488, 38 A. 460; Bey v. Bey, 83 N.J.Eq. 239, 90 A. 684; Schaffer v. Krestovnikow (Schaffer), 88 N.J.Eq. 192, 102 A. 246, affirmed 89 N.J.Eq. 549, 105 A. 239); and where it appears that such relationship is matrimonial, rather than illicit, cohabitation and reputation will justify the presumption that the parties came together under a mutual promise to live as husband and wife. Voorhees v. Voorhees' Ex'rs, supra; Wallace's Case, 49 N.J.Eq. 530, 25 A. 260; Mullaney v. Mullaney, 65 N.J.Eq. 384, 54 A. 1086."

 It is my conclusion that plaintiff in this case contracted such a common law marriage in the state of New Jersey and that she is therefore entitled to judgment in this cause.