### Ravindran v. Harleysville Insurance Company

*Alan Casper,* for plaintiff.
*James Haggerty* and *Scott Tredwell,* for defendants.

DiBONA JR., *J.,* April 8, 2002—

## FINDINGS OF FACT

*Procedural History*

(1) The present action involves a claim by the plaintiff, Priyamvada Ravindran, for bad faith damages pursuant to 42 Pa.C.S. §8371, in connection with the handling of an underlying underinsured (UIM) claim for injuries sustained in a February 29, 1996 motor vehicle accident.

(2) At the time of the February 29, 1996 accident, the plaintiff was a passenger in a 1992 Plymouth Voyager minivan owned by Roxborough Memorial Hospital, operated by Richard Hannigan.

(3) At the time of the accident, the minivan occupied by the plaintiff was struck at an intersection by a vehicle owned and operated by Carol Macedo.

(4) At the time of the accident, there existed in full force and effect a policy of insurance, issued by the General Accident Insurance Company, providing bodily injury liability coverage in the amount of $50,000/$100,000 to the owner of the striking vehicle, Carol Macedo.

(5) At the time of the accident, there also existed in full force and effect a policy of insurance, issued by Harleysville Mutual Insurance Company to Roxborough Memorial Hospital, providing bodily injury liability and underinsured motorist coverage each in the amount of $1 million.

(6) Eric Weitz, Esquire, of the law firm of Garfinkle and Corloman, was retained to represent the plaintiff in pursuing a claim for recovery of damages for personal injuries sustained in the motor vehicle accident.

(7) On May 21, 1997, plaintiff filed an action against the driver of the Harleysville vehicle, Richard Hannigan, and the owner of the striking vehicle, Carol Macedo, in the Court of Common Pleas of Philadelphia County.

(8) John A. Livingood Jr., Esquire, and Frederick T. Lachat Jr., Esquire, of the Law Offices of Gallagher, Riley and Lachat were retained by Harleysville to represent Richard Hannigan.

(9) Gary Nau, Esquire, was retained by General Accident Insurance Company to represent the co-defendant, Carol Macedo.

(10) On September 11, 1998, a settlement conference was conducted before the Honorable Charles Burr.

(11) During the September 11, 1998 settlement conference, counsel for the co-defendant, Carol Macedo, formally tendered the general accident policy limit of $50,000. Plaintiff apparently did not, however, request that Harleysville consent to any settlement with the co-defendant, Macedo, until September 17, 2001, at which time written notice of intent to proceed forward with a UIM claim was first provided.

(12) During the September 11, 1998 settlement conference, counsel for the plaintiff confirmed plaintiff's intent to accept the tender of the General Accident policy limits and proceed forward with a claim for UIM benefits against Harleysville Mutual Insurance Company. (N.T. 11/7/01 pp. 37-38.)

(13) Thereafter, in accordance with the arbitration clause in the Harleysville policy, a UIM claim was pursued by the plaintiff against the defendant, Harleysville.

(14) During the UIM claim, Eric Weitz, Esquire, continued to represent the plaintiff; Fred Lachat, Esquire, and John Livingood, Esquire, represented the defendant, Harleysville.

(15) The parties proceeded to select three arbitrators: the plaintiff named a plaintiff's arbitrator, Edward Dashevsky, Esquire; Harleysville named a defense arbitrator, Eileen Katz, Esquire; both parties selected a neutral arbitrator, the Honorable Abraham Gafni. (N.T. 11/7/01 pp. 50-51.)

(16) An arbitration hearing was scheduled for and conducted on April 30, 1999.

(17) After testimony, the arbitrators deliberated periodically over a period of several weeks.

(18) On June 9, 1999, an arbitration award of $750,000 was agreed to by two arbitrators, Judge Gafni and Mr. Dashevsky. Arbitrator Katz dissented. See exhibit D-88.

(19) The $750,000 arbitration award was later satisfied by the defendant, Harleysville.

(20) Thereafter, in January 2000, the plaintiff filed the instant cause of action for bad faith and extra-contractual, punitive damages pursuant to section 8371 of the Judicial Code, 42 Pa.C.S. §8371.

(21) Plaintiff has identified several theories to advance support of her claim for bad faith. Essentially, plaintiff argues:

"(A) That the defendant failed to attempt to settle the UIM claim in good faith before proceeding to arbitration;

"(B) That defendant improperly 'suppressed' evidence which was favorable to her claim;

"(C) That the defendant improperly 'manipulated' evidence during argument at the close of evidence during the underlying UIM arbitration;

"(D) That the defendant 'solicited insurance fraud' by suggesting that the plaintiff enter into a settlement agreement which contemplated certain specific findings of fact; and

"(E) That the defendant improperly engaged in 'ex parte' contact with the defense arbitrator after the close of evidence in the underlying UIM arbitration."

These claims will be addressed seriatim, below.

### A. Plaintiff's Claim That the Defendant Failed To Attempt To Settle the UIM Claim in Good Faith Before Proceeding to Arbitration

(22) Plaintiff's initial demand to settle the UIM claim was $1 million, the UIM policy limits. (N.T. 11/7/01 pp. 110-11.)

(23) In early April 1999, approximately one month before the April 30, 1999 arbitration hearing, the defendant, Harleysville, offered $100,000 to settle the UIM claim. (N.T. 11/7/01 p. 59.)

(24) Shortly thereafter, plaintiff countered with a slightly reduced demand of $950,000. (N.T. 11/7/01 p. 60.)

(25) On the day of the arbitration, Harleysville increased its offer to $200,000. (N.T. 11/7/01 p. 77 and exhibit p. 59.)

(26) During the arbitration hearing, the plaintiff rejected the $200,000 offer, but reduced her demand to $500,000. (N.T. 11/7/01 p. 78.)

(27) The parties did not reach a settlement agreement.

(28) The matter then proceeded through arbitration and the award of $750,000 was thereafter entered. (N.T. 11/8/01 pp. 145-46.) (Exhibit D-88.)

(29) The testimony presented at trial indicated that in making its settlement offers, Harleysville took into account many factors.

(30) For example, Harleysville considered questions that existed with regard to the plaintiff's medical claims of among other things, a "frozen shoulder" and various

soft tissue injuries to her neck and back in the 1996 accident.

(31) Specifically, Harleysville considered the medical records obtained in discovery which showed that the plaintiff had treated for seven months and been diagnosed with limited continuing disabilities after sustaining similar injuries in a 1994 motor vehicle accident. See exhibits D-43-46, D-50, D-52, D-55, D-57-58.

(32) Harleysville also considered medical records which showed that the plaintiff had been diagnosed with a "frozen shoulder" from injuries she received in a December 1995 slip and fall accident for which she was still actively treating at the time of the February 29, 1996 motor vehicle accident. See exhibits D-59, 63-64.

(33) Harleysville also considered issues with respect to plaintiff's claim for lost earnings capacity as a nursing supervisor.

(34) Specifically, Harleysville considered plaintiff's records of employment which called into question the plaintiff's continuing ability and motivation to work as a nurse before the 1996 motor vehicle accident. See exhibits D-6-7, D-9-41.

(35) In addition, Harleysville considered the medical and vocational opinions of experts it hired who raised additional questions as to the severity and cause of the plaintiff's injuries. See exhibits D-133-134, D-136, P-69.

(36) In addition, it is undisputed Harleysville requested and relied upon the advice of its counsel who repeatedly opined that the value of the case was consistent with the offers made. See exhibits D-120, D-125, P-7, P-9, P-10, P-13, P-15, P-39, P-42-44, P-88.

(37) Based on the evidence presented, this court finds that there existed a reasonable basis for Harleysville's settlement offers and that in light of the disparity between the demands and the settlement offers, the defendant's decision to exercise its contractual right to arbitrate the case was reasonable.

## B. Plaintiff's Claim That the Defendant Improperly "Suppressed" Evidence

(38) During the discovery phase of the tort litigation, the defendant obtained expert opinions of certain "consulting experts" whose testimonies were not used at trial.

(39) Harleysville considered and relied upon such expert opinions.

(40) During the UIM discovery, plaintiff issued certain interrogatories to defendant Harleysville seeking among other things the names of any expert expected to render a report, whether the expert was anticipated for trial or merely used as a consultant.

(41) Defendant's counsel refused to respond to these interrogatories.

(42) The issue was brought before the arbitration panel which ruled that defendant need not produce responses to any interrogatories.

(43) The decision of the arbitration panel was binding on the parties.

(44) It is undisputed that Harleysville relied upon its lawyers' advice that such consulting expert opinions need not be disclosed.

(45) There was no evidence that Harleysville knew or should have known it was under any obligation to disclose the opinions of any "consulting experts."

(46) There was no evidence that Harleysville instructed its lawyers to violate any rules of procedure, discovery, or rules of professional conduct.

(47) There was no evidence that Harleysville improperly "suppressed" any evidence.

### C. Plaintiff's Argument That Defense Counsel Improperly "Manipulated" Evidence and Violated a "Duty of Candor" During Closing Argument

(48) At the time of the arbitration hearing and in a subsequent memorandum of law, defense counsel argued that there was insufficient evidence a causal connection existed between the plaintiff's shoulder injury and the 1996 motor vehicle accident. See depositions of Fred Lachat and John Livingood.

(49) As discussed above, the defendant had a reasonable basis to question the plaintiff's claims at the time of the arbitration.

(50) It is undisputed that Harleysville relied on its counsel's advice regarding the propriety of the presentation of evidence and arguments.

(51) There was no evidence presented that Harleysville knew or should have known that any evidence or arguments presented on its behalf were in any way inappropriate.

(52) There was no evidence that Harleysville instructed its lawyers to violate any rules of evidence, ethics, or rules of professional conduct.

(53) There was no evidence that Harleysville improperly "manipulated" any evidence.

### D. Plaintiff's Argument That the Defendant "Solicited Insurance Fraud"

(54) During a break at the arbitration hearing, counsel for the defendant wrote a settlement offer on a handwritten note, which read:

"Offer: 200,000

"—willing to have entered by the panel w/a specific ruling that panel does not admit any evidence on med bills or wage loss covered by W.C. and that plaintiffs wage loss is due to December 7, 1995 accident, not to February 24, 1996 [sic] accident

"Offer will be withdrawn if not accepted before end of lunch break

"/s/Frederick T. Lachat

"4/30/99" (See exhibit P-59.)

(55) Plaintiff argues this offer was intentionally designed to induce a belief that she could settle her case in a manner which would eliminate any necessity for repaying any portion of the outstanding workers' compensation lien from the proceeds of the settlement.

(56) There was no evidence that the plaintiff was tricked, compelled or coerced to enter into such a settlement offer.

(57) Plaintiff was represented by an experienced lawyer who testified that he was well aware of the risks and ramifications of the settlement offer. (N.T. 11/7/01 pp. 80-81-82.)

(58) It is undisputed that Harleysville relied upon its counsel's advice that the settlement offer of April 30, 1999, was appropriate.

(59) There was no evidence that Harleysville knew or should have known there was anything inappropriate about the settlement offer.

(60) There was no evidence that the defendant instructed its lawyers to make any settlement offers which were in any way inappropriate.

(61) There was no evidence that the defendant "solicited insurance fraud."

### E. Plaintiff's Claims That Defendant Improperly Engaged in "Ex Parte" Contact With the Defense Arbitrator

(62) It is undisputed that after the arbitration hearing and before the arbitration award was entered, counsel for the defendant engaged in several private conversations with the defense arbitrator regarding the merits of the plaintiff's claim and the progress of the deliberations outside of the presence of counsel for the plaintiff or any of the other arbitrators.

(63) There was no evidence that any such private communications occurred at any point between the neutral arbitrator and either counsel.

(64) It is understood that Harleysville relied on its counsel's advice regarding the propriety of any communications with the arbitrators.

(65) There was no evidence that Harleysville knew or should have known that any private communications with its own arbitrator were inappropriate.

(66) There is no evidence that Harleysville instructed defense counsel to engage in any private communications with the defense arbitrator.

(67) There is no evidence that the defendant engaged in any "ex parte" contact.

## CONCLUSIONS OF LAW

(1) 42 Pa.C.S. §8371 provides:

"In an action under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

"(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3 percent.

"(2) Award punitive damages against the insurer.

"(3) Assess court costs and attorneys fees against the insurer."

(2) "Mere negligence or bad judgment" does not constitute bad faith. See *Polselli v. Nationwide Mut. Fire Ins. Co.,* 23 F.3d 747, 751 (3d Cir. 1994); see also, *Hyde Athletic Indus. v. Continental Cas. Co.,* 969 F. Supp. 289, 306 (E.D. Pa. 1997).

(3) An insurer is required to accord the interests of its insureds the same consideration it gives its own; "the insurer is *not* required actively to submerge its own interests." *Kosierowski v. Allstate Ins. Co.,* 51 F. Supp. 583, 588 (E.D. Pa. 1999).

(4) To be successful in prosecuting a bad faith claim in Pennsylvania, the insured must prove: (1) the insurer

lacked a reasonable basis for its actions, and (2) the insurer knew or recklessly disregarded its lack of a reasonable basis. See *Klinger v. State Farm Mut. Auto Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997); see also, *Terletsky v. Prudential Property & Casualty Insurance Co.*, 437 Pa. Super. 108, 125, 649 A.2d 680, 688 (1994).

(5) In addition, proof of harm is an essential element of the claim. See *Builders Square Inc. v. Saraco v. National Union Fire Ins. Co. of Pittsburgh, PA*, 1996 U.S. Dist. Lexis 19444 (E.D. Pa. December 27, 1996). ("While section 8371 provides an independent cause of action, no court has held that a plaintiff may sustain a section 8371 claim in the absence of proof of loss or damages from the bad faith conduct. There is no persuasive authority which suggests that the legislature intended to provide a private cause of action to punish bad faith conduct in a vacuum and to confer standing upon parties who could not demonstrate that they suffered some loss as a proximate result of such conduct.")

(6) Thus, in an action for bad faith arising out of an underlying underinsured motorist claim, the plaintiff must also show that the amount the arbitrators would have awarded would have been greater but for the alleged bad faith. See *Quaciari v. Allstate Ins. Co.*, 998 F. Supp. 578 (E.D. Pa. 1998) ("As an initial matter, plaintiff has not come forward with evidence of harm following from Allstate's change in position. Plaintiff seems to argue that it was the act of challenging plaintiff at the UIM arbitration, *i.e.*, cross-examining her about whether she looked both ways before entering the intersection on a

yellow light, and arguing to the panel that plaintiff was responsible, which forms the basis for her bad faith claim. Plaintiff, however, has offered no evidence tending to show that the amount awarded by the arbitrators would have been greater but for Allstate's conduct. Harm is an essential element of a bad faith claim. See *e.g., Builders Square Inc. v. Saraco,* 1996 U.S. Dist. Lexis 19444 (E.D. Pa. December 27, 1996).").

(7) These elements of the claim must be shown by clear and convincing evidence. See *Polselli v. Nationwide Mut. Fire Ins. Co.,* 23 F.3d 747, 751 (3d Cir. 1994), *aff'd,* 135 F.3d 763 (3d Cir. 1997).

(8) The duty of good faith and fair dealing continues even after litigation begins. *O'Donnell v. Allstate Insurance Company,* 734 A.2d 901 (Pa. Super. 1999); *Slater v. Liberty Murual Insurance Co.,* 1999 U.S. Dist. Lexis 3753 (E.D. Pa. 1999).

(9) "The plaintiff is not entitled to redress under section 8371 [for alleged improper litigation conduct] since the statute was designed to provide 'a remedy for bad faith conduct by an insurer in its capacity as an insurer and not as a legal adversary in a lawsuit filed against it by an insured.' " *O'Donnell v. Allstate Insurance Company,* 734 A.2d 901, 909 (Pa. Super. 1999), citing *Slater v. Liberty Mutual Insurance Co.,* 1999 U.S. Dist. Lexis 3753 (E.D. Pa. 1999).

(10) Generally, an attorney acts as an independent contractor when hired by the insurance company and, therefore, any conduct by the attorney *cannot be imputed* to the client. *Ingersoll-Rand Equipment Corporation v.*

*Transportation Insurance Company,* 963 F. Supp. 452, 455 (M.D. Pa. 1997), citing *McCarthy v. Recordex Serv. Inc.,* 80 F.3d 842, 853 (3d Cir. 1996); *Steiner v. Bell of Pa.,* 426 Pa. Super. 84, 88, 626 A.2d 584, 586 (1993).

(11) The plaintiff has failed to sustain her burden of proving by clear and convincing evidence that the defendant lacked a reasonable basis for its actions herein.

(12) Moreover, the plaintiff has failed to sustain the burden of proving by clear and convincing evidence a reckless disregard of a reasonable basis.

(13) The evidence introduced establishes that notwithstanding the fact that the plaintiff prevailed at arbitration, a reasonable basis to question her claim for UIM benefits existed, based on the medical records, expert medical opinions and expert legal opinions considered by the defendant.

(14) The evidence of alleged improper litigation conduct, including allegedly improper settlement offers, discovery responses, closing argument and communications with the defense arbitrator, is not sufficient to prove that the defendant, Harleysville, itself acted in bad faith.

(15) The plaintiff failed to sustain her burden of proving any harm as a result of the alleged bad faith conduct.

(16) Based on the evidence presented, this court rejects the plaintiff's claims, in toto, and finds in favor of the defendant, Harleysville Mutual Insurance Company.

Therefore, a verdict is entered in favor of the defendant, Harleysville Mutual Insurance Company, and against the plaintiff, Priyamvada Ravindran.